FRANK DENNIS, respondent,

*v.*

GLENWOOD CEMETERY, appellant.

[Decided May 19th, 1924.]

On appeal from a decree in the court of chancery advised by Vice-Chancellor Foster, who filed the following opinion:

. "The bill was filed to compel the payment of six bonds of $500 each of the cemetery association, and as an incident thereto for an accounting, and also for the benefit of a vendor's lien. Complainant died after the commencement of the action, and his executors have been duly substituted as complainants.

"The cemetery assiciation has filed its answer and also a counter-claim, under which it has brought in all of the incorporators of the association and those claiming under them as bondholders.

. "The controversy arises out of the following circumstances: Between 1892 and 1894 George W. Brown and six of his friends decided to convert about thirty-five acres of Brown's farm at Long Branch into a cemetery. Each of the six paid Brown $1,000 for a one-seventh interest in the property which Brown conveyed to them.

"The seven then incorporated the Glenwood Cemetery Association on November 4th, 1894, under the Cemetery act of 1875, and elected themselves its trustees. Between the date of the conveyances from Brown and November 29th, 1895, when twenty-nine and twenty-five hundredths acres were conveyed by the incorporators to the association; some work was done and money expended in the development of the cemetery. By a resolution adopted in April, 1895, by the incorporators, they agreed to sell the property to the asso-

ciation for $21,000, and also reserved to each of them, without cost, a burial plot in the cemetery. Out of the original tract of thirty-five acres the incorporators retained about five and seventy-five hundredths acres in their individual names, because they understood the law would not allow the association to hold title to more than thirty acres, and these five and seventy-five hundredths acres are admitted to be the property of the association, subject only to the rights of the incorporators to have paid them the purchase price for the entire property.

"To provide for the payment of this purchase price the association issued to the incorporators or to their assigns forty-two debenture bonds for $500 each, of like tenure, purport and effect, and aggregating $21,000. The principal of the bonds was made payable on May 1st, 1922, with interest at six per cent., payable semi-annually.

"Complainant was neither an organizer nor incorporator of the association. Two of the six bonds owned by him he bought on June 17th, 1902, from William H. Morris, Jr., one of the seven, and an incorporator, for $1,000; the remaining four bonds he bought for $2,060, on the same date, from one Warwick, to whom they had been sold and assigned by Morris; the bonds had not been issued at this time, and, in the instruments transferring or assigning them, they are referred to as 'stock or bonds.'

"The incorporators continued in control of the association until about 1907, and during this period the association received from the sale of lots over $18,000, and it paid interest on most, if not all, of the bonds, and it also expended money in the development of the cemetery, but did not create any particular fund for the care of the lots, nor for the payment of the bonds at maturity.

"Payment of the principal and interest of the bonds is resisted by the association on the following grounds: That the bonds were fraudulently issued to pay the incorporators, as promoters, an excessive secret profit of two hundred per cent. on their investment of $7,000; that the bonds are non-negotiable, and that complainant's bonds are therefore sub-

ject to all the equities against the entire issue, and that the incorporators and those claiming under them, as bond-holders, are estopped from collecting the amount, if any, due them until a fund for the perpetual care of all lots in the cemetery has been created.

"There is no proof of any fraudulent conduct on the part of any of the incorporators in issuing these bonds, or in any other transaction relating to the cemetery. It is true that they sold the land for which they paid $7,000 to the association for $21,000, and it is also true that by accepting these bonds therefor they postponed the reimbursement of their original investment and also their prospective profits for a period of twenty years, or, if taken from the date of their investment in 1894, for a period of twenty-seven years.

"The proofs also fail to show these incorporators to have been promoters in the legal meaning of that term; they were, and continued to be, the only parties financially interested in the undertaking; they took and continued to keep all the risks incident to the enterprise; the extent or the return on their investment, or their profit, is definite and liquidated, and they cannot therefore be considered as promoters taking a secret profit, under the opinion of the court of errors and appeals in *Attorney-General* v. *Linden Asso., 85 N. J. Eq. 501,* reversing the opinion of this court in *Bliss* v. *Linden Asso., 83 N. J. Eq. 495.* This opinion of our appellate court is in line with the opinion of Vice-Chancellor Stevens in *East Ridgelawn Cemetery* v. *Frank, 77 N. J. Eq. 36,* and of the United States supreme court in *Old Dominion Copper Co.* v. *Lewishon, 210 U. S. 206,* as well as the supreme court of Massachusetts in *Old Dominion Copper Co.* v. *Bigelow, 203 Mass. 159,* and also of the case of *Seymour* v. *Spring Forest Cemetery Co., 144 N. Y. 333.*

"The record also fails to support the contention that the bonds are non-negotiable.

"The terms of the bonds do not limit the payment of principal out of any particular fund; the promise to pay the principal is unqualified as required by the Negotiable Instrument act [*Comp. Stat. p. 3755*], and while the interest

26

is promised to be paid out of the proceeds of the sale of lots and the profits of the association, there is nothing to indicate that it may not be paid out of other assets of the association. This, in effect, is unqualified, because such payment of interest is not to be made from any particular fund, but is to be paid from all the income, profits and assets of the association.

"The circumstances under which these bonds were issued, the parties who issued them and the purpose for which they were issued, all negative the claim that they were intended to be qualified promises to pay, for they were issued to re-imburse the men who authorized their issue, the amount of their original investment, and also their prospective profits, and it is inconceivable that these incorporators, having power to do otherwise, intended by this bond issue to pay themselves with an uncertain promise, and were willing to limit such reimbursement and payment to a particular and uncertain source, particularly in view of the fact that they knew the law authorized them to set aside fifty per cent. of the proceeds of the sale of lots for the payment to them of the purchase price of the property. This contention is further answered by the fact that the incorporators and the association at and before the issuance of the bonds considered and treated them as negotiable, for Morris sold and assigned his right to bonds to Warwick and Dennis, and the association confirmed and ratified these assignments by issuing the bonds to Dennis.

"The claim of estoppel presents the real difficulty in the case due to this situation.

"Section 10 of the Cemetery act [1 Comp. Stat. p. 375] provides that, after setting aside at least fifty per cent. of the proceeds of the sale of lots to the payment of the purchase-money, the residue shall be used for preserving, improving and embellishing the cemetery grounds, &c.

"In 1895 and 1896 the association, while the incorporators-bondholders, with the exception of Dennis, were in control, issued circulars in which it was represented the association would set aside forty per cent. of the proceeds of the

sale of lots for their perpetual care, and the form of deed the association adopted contains the endorsement 'Open Lawn Plan with Perpetual Care.'

"The association has failed to create a fund for this purpose, and, after all the years that have elapsed since these representations were made, the only assets the association has at this time for this and all other cemetery purposes are about $11,000 in cash and unsold lots, including the five and seventy-five hundredths acres mentioned, from which it is estimated it may, in the course of time, realize from $118,-000 to $235,000, from which must be deducted the cost of the development and sale of these lands and the incidental expenses of the association.

"It is estimated that there is now due on this bond issue for principal and interest about $40,000; it is further estimated that a fund of at least $70,000 will be required to furnish the income for the perpetual care of the lots in the cemetery, in which over one thousand six hundred interments have been made.

"While there is nothing in the record impairing the validity of the bonds, the right of their owners to compel their payment must be considered in connection with the paramount rights of the owners of lots in the cemetery, who presumably purchased in reliance upon the representations made respecting the perpetual care of their property and without knowledge of the existence of this issue of bonds.

"The courts have described the management of a cemetery association as a charitable, or a pious, or a sacred trust, and the fact that it is all of these must not be lost sight of in determining the relative rights of all the parties to this controversy. The solution of the difficulty is further complicated by the death of five of the incorporators and the incapacity of another, as well as by the death of the complainant, who lived for years in the immediate vicinity of the cemetery, and who purchased his bonds years after the representations about perpetual care were made and circulated in the neighborhood and after lots in the cemetery had been sold.

"In view of the conclusion I have reached that it is the primary duty of the court to protect the rights of the lot owners and to insure them, so far as possible, the care of their plots for which they have paid, and as it is necessary for the accomplishment of this purpose that a sufficient fund should be created from the proceeds of the sale of lots, and as it is also necessary to obtain from the association's assets the fund necessary to pay the amount due on this bond issue, I should like to hear from counsel in settling the terms of the decree how these various objects can be accomplished without impairing the rights of any of the parties in interest."

### SUPPLEMENTAL OPINION.

"In the memorandum filed by me in the above matter on February 24th, 1923, I requested counsel to give me their views on the method to be embodied in the decree which would provide for the care of the lots heretofore sold for burial purposes, and also for the care of lots hereafter sold, and including the care of the cemetery as a whole and its general management and development, and which would also provide for the payment of the principal and interest of the bonds owned by complainant and others.

"As a result of this request I have had several conferences and quite some correspondence with counsel, with the result that my suggestion that the initial investment of $1,000, made by each of the seven bondholders, should be repaid them from the funds, amounting to about $18,000. now in the treasury of the cemetery association, seemed to be acceptable to all parties, with this qualification, viz., that the $7,000 thus to be paid should be divided among the seven bondholders on account of both principal and interest, so that all would have interest paid therefrom on their respective claims of $3,000 each up to the common date of November 1st, 1907.

"This payment of $7,000 would leave a balance due the bondholders of unpaid principal of $14,000, and accrued

interest for fifteen years, from November 1st, 1907, to November 1st, 1922, on the original debt of $21,000, amounting to about $18,000.

"At the conferences mentioned, and after consideration of the arguments of counsel, I held the representation made by the cemetery association to give perpetual care to the lots it had sold, imposed no greater duty than that imposed by section 10 of the Cemetery act, which directs that fifty per cent. of the proceeds of the sale of lots shall be first applied to the payment of the purchase price of the property, and the remaining fifty per cent. to the care, improvement and embellishment of the cemetery.

"I further held that as the original bondholders, who were also the incorporators and who were for many years the sole trustees of the cemetery, had ignored their statutory duty and had neglected to pay themselves the amount due them for the price of the property, and had likewise neglected to create from the proceeds of lots sold the fund required by the statute for the care of the cemetery; that the equities of the situation required that the care of the cemetery should receive the first consideration, and to accomplish this purpose I have reached the conclusion that the balance of the funds now in the cemetery's treasury [after the payment of the $7,000], and all additions thereto, should be kept intact and invested, and that from the annual income received therefrom, and from the gross receipts of the sale of lots and from any and all other annual income and receipts [except gifts, bequests and devises], there should be created annually a fund not exceeding $3,000 for the care, management and development of the cemetery; that from the balance of such gross annual receipts and income seventy-five per cent. thereof shall be paid annually on account of the $14,000 balance of principal due the bondholders, until such balance has been paid in full, with legal interest thereon from November 1st, 1922, and that thereafter said seventy-five per cent. shall be paid annually on account of the interest owing to the bondholders on the original debt of $21,000, to November 1st, 1922. The remaining twenty-five

per cent. of the annual income and receipts is to be invested and used by the trustees as they determine for the care, improvement and embellishment of the cemetery.

"This litigation is the direct result of the neglect of all parties to it, and, therefore, no costs can be allowed to either party against the other, and any party has leave to apply at any time for such further relief as the circumstances may require."

*Mr. Wilbur A. Heisley,* for the appellant.

*Messrs. Wilson & Smock* and *Mr. John W. Slocum,* for the respondent.

PER CURIAM.

Our examination of the pleadings and proofs sent up with the present appeal satisfies us that the conclusions of the learned vice-chancellor are sound, and that the decree appealed from should be affirmed. It will be so ordered.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK—13.

*For reversal*—None.