# In re Limestone Cemetery

*S. W. Blackman,* for petitioners.

*Joseph H. Goldstein,* for cemetery association.

FLICK, P. J., August 1, 1960.—Before the court is a petition signed by the Limestone Cemetery Association by its president and secretary and by 27 residents of Limestone Township, Warren County, averring that the public cemetery in said township, owned and operated by Limestone Cemetery Association since 1886, is being neglected because said association, a nonprofit corporation chartered in 1885, has insufficient funds for proper care of said cemetery. Petitioners pray the court to direct that title to the cemetery be transferred to the Supervisors of Limestone Township, and said cemetery be cared for by the supervisors pursuant to article VII of The Second Class Township Code, as amended.

### History

The petition was filed July 16, 1958. It is acknowledged by Edmond B. Bimber, who, being duly sworn, deposes and says that he is president of Limestone Cemetery Association, one of petitioners, and that the facts set forth in the petition are true and correct to the best of his knowledge, information and belief. The president's signature is attested by Ray Brownell, as secretary of the corporation, who also swore to the facts to be true and correct, and that the signers of the petition are all residents of Limestone Township, Warren County. On August 14, 1958, a hearing was held on the petition in open court, at which petitioners were represented by counsel and the Supervisors of Limestone Township were also represented by counsel.

At the hearing the following exhibits were put in evidence by petitioners: The petition, to which no answer was filed; application for charter for Limestone Cemetery Association, as a nonprofit corpora-

tion under the Act of April 29, 1874; proof of publication of notice that application will be made; proposed articles of incorporation and order of court dated September 7, 1885, approving the charter and bringing the Limestone Cemetery Association into being as a nonprofit corporation for the purpose of maintaining a public cemetery in Limestone Township, upon recording of the charter and order of court. As appears by notation thereon, these were recorded September 14, 1885, in the Recorder's Office of Warren County in charter book no. 1 at page 507. Also in evidence are a copy of the bylaws of the corporation, a deed to the corporation from Katharine McKean et al., dated May 27, 1886, and recorded in Warren County Deed Book, 80, page 634 on March 28, 1896, conveying "about one acre and 153 perches of land"; an unsigned copy of a right of way from the corporation to the Tide-Water Pipe Co., dated September 4, 1908, "across a portion of the Cemetery Company's land," and a plat. labeled "Plan—Limestone Cemetery Association—Lots." showing 57 numbered lots. Testimony on behalf of petitioners was given by Ray Brownell, secretary of the corporation, who has held that position about three years. Two witnesses were called on behalf of the Supervisors of Limestone Township. These were Fred Yeager, a supervisor for eight years and president of the board, and Oakley Lynch, a supervisor for 20 years. It must be noted that these two gentlemen, and the third member of the Board of Supervisors of Limestone Township as well, signed the petition. This was done in their individual capacities as residents of Limestone Township. Officially, as the Township Board of Supervisors, they took no action in regard to the matter. In fact, it is doubtful that they support the petition, even as individual citizens, for Fred Yeager, when asked why he had signed the petition as an individual, replied:

"Well, just because the other two did, I guess." Record, page 19.

The situation disclosed by the record is not unique. Many small nonprofit cemeteries throughout the country present a more or less neglected appearance, and the explaination is usually the same; sufficient funds have not been set aside for perpetual care. Some small cemeteries relied on gifts for maintenance, which were authorized for nonprofit cemeteries by the Act of April 29, 1874, P. L. 73, and are now authorized by the Act of August 10, 1951, P. L. 1199. Some relied on actual maintenance work performed by the lot owners or relatives of the interred. Beginning with the Act of March 11, 1909, companies such as Limestone Cemetery Association have been required to set aside a sum equal to at least one tenth of the gross amount received from the sale of lots for perpetual care and preservation of the grounds. This they are now required to do by the Nonprofit Corporation Law of May 5, 1933, P. L. 289. The minimum requirement is still only 10 percent. It should certainly be increased. The evidence does not show whether the Limestone Cemetery Association sold any lots after 1909, but, if this was done, the law was not complied with for the association has no funds acquired from the sale of lots. It does have $1,100 "donated from time to time by the people . . . to keep for future maintenance." This fund is held in trust by the Warren National Bank and earns about $25 a year which is all the money available for maintenance of the cemetery.

Authority to spend township funds for the maintenance of cemeteries begins with the Act of May 24, 1917, P. L. 292, which authorized the supervisors, on petition of 25 citizens residing within five miles of a cemetery neglected so as to become a nuisance, to spend $15 when ordered by the court to cut brush,

grass, briars and weeds in August of each year. The Act of May 10, 1923, P. L. 198, increased the authorized expenditure to not more than $30 for any one cemetery, provided that the supervisors could be ordered to cut the brush, etc., twice a year, before May 30th and on August 15th. The Second Class Township Code of May 1, 1933, P. L. 103, continued the $30' expenditure. It was increased to $60 in 1949 and to $100 in 1953. This sum is continued as the limit for township funds which the court may order the supervisors to spend for maintenance of neglected cemeteries, by the amendment of July 5, 1957, P. L. 529, 53 PS §65728. This is the act under which the petition was filed in this case and will be quoted in full later on in this opinion.

If the managers or members of the cemetery association, incorporated or unincorporated, have relied on the descendants and relatives of those buried in the cemetery to see that the graves are not neglected, with the passing of time such relatives or descendants may die or move away from the community. This seems to be the case with the Limestone Cemetery Association. No moneys from the sale of lots have been set aside for perpetual care, and the only money available is the $25 annual income from the donated maintenance fund.

The court could find no recorded case dealing with this situation. It may be that the only good solutions must be practical solutions and not those afforded by the law. However that may be, the court must try to arrive at a reasonable solution for the issue raised by the petition, a solution authorized by law. The matter has been given much study and is now ready for such solution as the court can find.

### Discussion

One of the safeguards for the long-suffering taxpayers of our country is the hard and fast rule that

public funds may not be expended without statutory authority, express or necessarily implied. Authority for spending township funds for the upkeep of the cemetery owned by Limestone Cemetery Association is found in the 1957 amendment to The Second Class Township Code of July 5, 1957, P. L. 529, which reads as follows:

"Whenever any cemetery or burial ground, incorporated or unincorporated, is abandoned, or is being neglected although occasionally used for burial purposes, either of the following actions may be taken: (1) The township supervisors may give notice to the owner thereof, directing him to remove the weeds, refuse and debris therefrom within thirty days. If the weeds, refuse and debris are not removed within thirty days after such notice, the supervisors shall cause the same to be done by employes of the township or persons hired for the purpose at the expense of the township. In no case shall the township supervisors expend more than one hundred dollars in any one year on any one cemetery. All costs and expenses of such removal shall be a debt owed to the township by the owner of the cemetery or burial ground, and may be collected therefrom as like debts are collected, or (2) the court of quarter sessions of the county, upon petition of twenty five residents of the township wherein such cemetery is located, may direct the supervisors to care for such cemetery at a cost of not more than one hundred dollars in any one year. The supervisors shall expend moneys from the general township fund for such purposes. Such cemetery shall remain open to the public under the regulation and control of the supervisors": As amended July 5, 1957, P. L. 529, sec. 1, 53 PS §65728.

The petition in this case is that contemplated in section (2) of the foregoing act, but section (1) is also given in full because the court has considered

whether it could be applied to the factual situation disclosed in the record of this case.

The facts before the court are as follows: Details as to granting a charter to Limestone Cemetery Association in 1885 as a nonprofit cemetery corporation under the act of April 29, 1874, and also the purchase by the corporation, in 1886, of slightly under two acres of land at the northwest corner of the McKean Farm in Limestone Township, where the cemetery is located, are given above. The petition for approval of articles of incorporation states that the 39 persons who signed the petition and articles have "associated themselves together for the purpose of maintaining a public cemetery in the Township of Limestone." The corporate purpose is stated as: "Maintaining a public cemetery in the Township of Limestone for the burial of the dead," and the business of the association is to be conducted in the township. The term of existence is perpetual. The value of real and personal property owned by the association is not to exceed $10,000. Provision is made for election of officers and directors and for the adoption of bylaws for the regulation of the business of the corporation. Annual meetings are provided for. The association shall have no capital stock "but each member of the corporation shall have equal rights and privileges, subject to such rules and by-laws as the Association may adopt," and "the Corporation may provide in its By-laws for the admission of other persons to its rights, privileges and membership."

The bylaws of the corporation, undated, contain 11 sections, giving detailed provisions as to the conduct of its affairs, election of directors, a president, secretary and a treasurer, annual meetings of the members, and four regular director's meetings a year. The secretary shall not only keep the minutes of the board of directors but "he shall be charged

with the general care of the grounds, under the direction of the Directors. He shall receive all funds due the Association and pay the sum over to the Treasurer." All deeds or conveyances for lots or burial rights are to be signed by the president and secretary. The secretary and the treasurer are to be bonded, and the latter "may be allowed one percent as full compensation for all funds received and paid out by him." The sexton, appointed by the directors, "shall open and close all graves," and "he shall receive for his services in the opening and closing of graves, five feet and upwards in length, three dollars, and graves under four feet in length, two dollars, the fee for opening and closing graves must be paid to the Secretary before a permit issues for the opening of graves." Section 9 provides:

"The Secretary shall be allowed as full compensation for selling lots and attending to duties connected with the sale, in receiving payment, making out Deeds, etc., two percent from all sales of lots and paid over to Treasurer, and for all other services such per diem amount as the Directors deem just."

Section 10 provides for the election of directors at the annual meeting of the association and that "each and every lot owner shall be entitled to one vote for Directors." The final section provides for amendment of the bylaws at any annual meeting of the association "by a two-thirds vote of those present, entitled to vote."

All of the foregoing facts are here set forth in order to show the nature of this cemetery association, how it functioned, and its contemplated finances. No mention is made of any moneys or funds for perpetual care of the cemetery grounds. It may very well be that each lot owner was expected to take care of his own lot, but no provision is made for care after the lot owner is buried.

How the association functioned since 1886 can only be surmised by the court from the foregoing facts and from the meager testimony on this subject in the record. Mr. Brownell, asked how he became secretary of the association, said: "The books were turned over at the meeting . . . Mrs. Cross asked if I wouldn't take over the work on account of her age and I said, yes." He said he did this "because no one else would take the responsibility, I took it." No regular meetings have been held since he took over. He has not determined from the books the number of graves or the number of members.

No lots have been sold and no persons have become members in the past few years. He had never checked up to determine how many unsold lots there are. Asked if the association was actually functioning as an association, if meetings were held: "That's one reason I asked for this Petition is because there has not been any functioning." Asked to explain why the petition was prepared and presented, he said:

"A I feel personally that I am just one and I cannot give any time and attention to it and many of the old people who are buried there haven't sons to follow through and take care of it and secondly, we haven't the money to do much. We have about twenty five dollars a year from a fund that was donated and that will not take care of the cemetery so this petition is put in under the law to do something to maintain the Cemetery in the future.

"Q This really then is a matter of time and funds that are not available?

"A I am looking ahead to the future, what maintenance we can give there on a fund of twenty five dollars a year.

"Q Will you tell the Court about the fund from which that twenty five dollars a year is derived?

"A That money was all donated from time to time by the people. None of it was from the sale of lots and the purpose of this fund—it was donated to keep it for future maintenance.

"Q Where is that money now?

"A That's in the Warren National Bank.

"Q In the Trust Department of the Warren National Bank?

"A It's in a Trust Fund.

"Q Do you know the balance that the Warren National Bank has on hand now?

"A Eleven hundred dollars.

"Q What does the Corporation propose to do with this money if the Supervisors take over the Cemetery?

"A The interest from the eleven hundred dollar fund is to go to the Supervisors each year for maintenance purposes.

"Q The Fund will be continued, however?

"A Yes, sir.

"Q And the income will go to the Supervisors?

"A Yes, sir."

Mr. Brownell also testified that since he had taken over as secretary he had expended the $25 annual income from the association's trust fund for care of the cemetery to have the brush cut one day a year and to put a few loads of gravel on the lane leading into the cemetery from the Warren-Tidioute Road: Record, pages 11 and 15. He also testified that the expenditure of $125 a year, $25 from the association's fund and $100 from township funds, would not maintain the cemetery "as it should be maintained but we hope to keep it from going to rack and ruin."

Mr. Yeager, president of the board of supervisors, testified that there are about 165 graves in the cemetery, including the graves of 13 soldiers. He also

testified that the lane running into the cemetery from the road, shown in the deed is nine feet wide, and a little over 1,000 feet long, is just "two tracks through a field," and it would be necessary to build and maintain a road into the cemetery; that it would be necessary to rebuild the whole fence around the cemetery. That there is a parking lot, fenced in, 100 feet long and 60 feet wide; that going into the cemetery proper there are two stone pillars which are falling apart and have to be rebuilt, and the two gates, to drive in and to walk in, which have to be replaced. He also testified that the grass should be mowed twice a month in the fall and at least that often in the spring; that it would be necessary to purchase power equipment at a cost of about $125 to do the mowing; that there is a building at the cemetery to house such equipment but it would have to be rebuilt.

His testimony clearly shows that it would cost quite a good deal of money and would require a lot of work, which the supervisors would have to hire, in order to put the cemetery in good shape and maintain it. He testified that $100 a year would not be enough "to take care of it like it should be." He said: "It would help." He testified that the supervisors had no objection to appropriating $100 a year to help care for the cemetery, and that it should be cared for, but this sum "would never fix it up." Quite obviously Mr. Yeager did not think $100 a year was enough to do a good job in fixing up and taking care of the cemetery, but he believed it should be maintained and $100 a year would help.

Mr. Oakley Lynch, Limestone resident for 22 years and township supervisor for 20 years, testified that he did not own a lot in the Limestone Cemetery but had bought one at Starbrick, in the Warren County Memorial Park Cemetery, "because it has perpetual care." He also said that during the time he had lived

in the community the only care or attention which the cemetery had received "just individual people come and fix up their own lots." He also testified that, as supervisor, "he would be perfectly willing that the Township pay the one hundred dollars a year toward the upkeep." However, he was opposed to the idea of an order of court directing the supervisors to care for the cemetery, because, he said: "We can not do anything on one hundred dollars a year toward keeping up the Cemetery." He testified that it was "Just out of the question to do anything" with only $100 or $125 a year, because "there is so much to do I don't know where you would start; that this amount of money would just about pay for cutting grass." He definitely did not want to see the supervisors made responsible for the supervision and maintenance of the cemetery for he believed it would be an impossible job to maintain it properly with only $125 a year to spend for that purpose.

The court can well sympathize with Mr. Lynch. The evidence shows that the Limestone Cemetery has been shamefully neglected. It cannot be classified as an abandoned cemetery under the law for it has certainly not lost its identity as a graveyard: Petition of Chester Monthly Meeting of the Religious Society of Friends, 56 D. & C. 231, 251, 5 R. C. L. 242. Just as certainly it must be classified as a cemetery which is being neglected, which brings it within the scope of the Act of July 5, 1957, P. L. 529, 53 PS §65728, as above quoted in full. It can easily be identified on the aerial survey map and tax map of Warren County as a plot of about two acres at the northwest corner of the Mc-Kean Farm. The northerly and westerly boundaries are wooded, being part of the Allegheny National Forest. The southerly and easterly boundaries are farm land. A lane runs about 1,000 feet along the westerly boundary of the farm to the Warren and

Tidioute Road. It seems from the record that the original members of the association contemplated having the cemetery maintained by the lot owners. Now, those who started the cemetery are gone, or practically so, and the young people don't live in the community, so that there is nobody to take much of an interest in the place. However, an iron fence, stone pillars and a drive in and a walk in gate were erected on the grounds, and moneys now totaling $1,100 were "donated from time to time by the people . . . to keep for future maintenance." The sentiments of those who gave the money and saw to the erection of the fence, pillars and gates seem to have gone with them.

Very little has been done in recent years to keep up the cemetery. The secretary noticed that two or three graves had been mowed each year but he paid no attention to whose they were. The $25 income from the maintenance fund has only enabled the association to cut down the brush once a year or put three or four loads of gravel on the access lane. The testimony shows that work must be done on the road or lane which leads in to the cemetery. The whole fence around the cemetery must be rebuilt. The two stone pillars at the gate must be rebuilt. The two gates must be replaced. The building on the property needs to be rebuilt in order to make it usable for storing equipment. For continuous maintenance, the grass in the cemetery should be mowed at least twice a month in the fall and more often than that in the spring. The $100 a year from the township funds which might be available under this proceeding, plus the $25 per year from the association's maintenance trust fund, would never be enough to pay for all that needs to be done in order to fix up the cemetery. Expending this money would help some. All witnesses agreed that it would be better to spend this sum than not to spend it. The supervisors do not wish to be directed by the court to care for the

cemetery, spending no more than $100 of township funds a year as the act provides, for they could not do a good job of keeping up the cemetery with such a limited amount of money.

From all of the foregoing it would seem fairly clear that the court could find the Limestone Cemetery is being neglected and could "direct the Supervisors to care for said Cemetery at a cost of not more than one hundred dollars in any one year," as provided in the act hereinbefore quoted. However, the solution of the situation presented by the record in this case is not that simple. The evidence is too meager to take final action. It has not been shown that the Limestone Cemetery Association is totally incapable of fulfilling the purpose for which a charter was granted to it in 1885, to wit: "Maintaining a public cemetery in Limestone Township for the burial of the dead." This court has recently had occasion to study the law applicable to nonprofit cemetery corporations, both as to the granting of charters to such corporations and the activities of such corporations. See Application for Amendment of Articles of Incorporation of Warren County Memorial Park, 37, August term 1958, opinion of April 8, 1960. In that opinion, at page 14, the court said:

"Under Pennsylvania law, a non-profit cemetery corporation and the individuals who control its activities, Mr. and Mrs. Ferver in the instant case, bear a fiduciary relationship not only toward lot owners and relatives of persons buried in the cemetery, but toward residents at large of the community. 'There is a sense of public interest and public benefit to be reckoned with in the grant of a non-profit charter . . . a quid pro quo for the community: In re: National Foundation of Dramatic Arts, 62 D. & C. 343, 346. This trust relationship is stated in 14 C.J.S., page 67, as follows: 'Cemetery corporations are usually regarded as organized for public rather than private purposes, and their

management has been held to be in the nature of a charitable, pious, or sacred trust.' " On page 20, cases are cited holding that the applicant for a charter of a nonprofit corporation "must affirmatively show that the public interest receives a quid pro quo from the corporation."

The issue raised by the petition cannot be disposed of without a searching inquiry as to whether Limestone Cemetery Association can fulfill all or any part of its obligation to the public. This is true, not only because the spending of public moneys is involved, but because of the nature of the association's function. "No proceeding, however, dealing with a cemetery should be taken lightly, even by the court, and due consideration must be given to the sentiment and respect we all hold for the memory, and place of repose, of our dead": First Evangelical Lutheran Church Petition, 13 D. & C. 2d 93, 99. The issue here is larger than this one case. In the Warren County Memorial Park case, supra, Mr. Ferver, manager of that cemetery and familiar with the cemeteries in Warren County, was quoted as saying: "In the past cemetery associations had made the mistake of not setting aside sufficient funds for perpetual care of their grounds, burial lots, or graves; that there were forty-three cemeteries in Warren County, most of them needing attention and care but without funds": Page 7.

No effort was made in this case to determine who the members of Limestone Cemetery Association are and what they may be able to do, or plan for the future, to help take care of the cemetery. The secretary noticed two or three graves mowed each year but did not know whose they were or who was doing the work. It was not shown that any effort had ever been made to obtain help from Veterans' organizations although 13 soldiers are buried there. The number of burial rights outstanding was not shown, or the exact number

of graves and the persons buried, or their heirs who may have inherited the lots, or the number of unsold lots.

Another feature shown by the evidence is that the association, although in feeble shape, is not defunct. It has a maintenance trust fund of $1,100. Some persons are actively interested for some graves are cared for each year. Twenty-five residents of the township signed the petition, and they at least feel that something should be done to keep up the cemetery. It was not shown that any great effort was made to find out who could be relied on and what help they could give. Other cemeteries faced with the need to augment perpetual care funds have obtained small donations over a 10 or 15-year period, from lot owners or relatives of persons buried there.

The secretary of the association is concerned about future care of the cemetery but he has not given up. Asked if he expected the association to continue, he said: "If it's to get members enough to maintain it so that we have supervision, yes, it will be continued, and if we haven't, of course, the thing will go to pieces." He also was asked if the corporation would continue for the mere purpose of securing interest on the $1,100 trust fund investment, and he replied: "We will have to continue if we can get members enough for a Board in order to keep the Corporation alive. Otherwise the thing is dropped, just as it is right now. That's why we want someone to take care of it." Asked if he had in mind that the supervisors would take over the whole control and maintenance of the cemetery, Mr. Brownell said: "A. Not necessarily the whole control and maintenance but to use that hundred dollars that the law provides, or said they could use. I don't say they must take over the total responsibility of the cemetery but to use that hundred dollars for upkeep."

By receiving its charter the cemetery assumed the duty of maintaining a public cemetery in Limestone Township. The corporation consists of its members, officers and directors. Together they must perform their obligations to the public to the best of their ability. It has not been shown that any effort has been made to secure such performance. It has not even been shown who the members are. The problem facing the association is a practical one. Research must be done in the available books and records of the association, and in the cemetery itself, to identify all persons now buried there. The record shows there are about 160 graves. If descendents could be located to the number of 100 persons, and they have sufficient pride in helping to care for the graves of their ancestors so that they could be persuaded to contribute five dollars each year for 10 years, the maintenance trust fund of the association would be increased by $5,000. Some descendants might prefer to contribute their services, at least to care for their own lots, as two or three are doing now.

Identifying those buried and also the whereabouts and identity of their heirs, is quite a research project, and it will no doubt take a lot of time and effort by way of letters and personal contact to secure contributions to a perpetual care trust. However, the court feels that such effort must be made rather than to hand the whole problem over to the township supervisors. Until or unless such effort is made, the court does not feel justified in directing the supervisors to care for the cemetery. By way of help, the court has been informed that the data on all the tombstones has been copied down by the Warren County Historical Society which has also obtained information as to the cemetery from church records.

The court sympathizes with those involved with this problem. The population of Limestone Township is

small; there are only 105 registered voters. Much of the land is owned by the Federal government as part of the Allegheny National Forest and more will be acquired, which increases the local tax burden. Simply handing the problem over to the township supervisors without making a considerable effort to solve it by other means, is too much like going on relief. The association cannot thus dispose of its obligation on the record now before the court. If it can be shown that the descendants of those buried in this little cemetery do not have sufficient pride to assist in maintaining the graves and the grounds, then some final disposition of the matter must be made. In the meantime, only a preliminary order can be made, directing the supervisors to contribute $100 a year towards the maintenance of the cemetery. This sum is to be paid to the Limestone Cemetery Association, when requested. The supervisors are not responsible for spending this money, but they should keep track of the condition of the cemetery, and if the funds are not used for the purpose for which they are appropriated, the court should be informed. It may be that the supervisors can be of some help other than furnishing $100 a year, and if this is the feasible thing to do, they should give such assistance, for the cemetery is a public cemetery for the township.

This order shall be effective for a period of three years, at the end of which the association shall make a report to the court as to any progress made in securing funds or services for the cemetery. For the foregoing reasons, the court makes the following preliminary order:

*Preliminary Order*

And now, August 1, 1960, upon consideration of the entire record in this matter, and for the reasons stated in the foregoing opinion, it is hereby

Ordered that the supervisors of Limestone Township, Warren County, shall pay from the township funds to the Limestone Cemetery Association the sum of $100 per year for the years 1960, 1961 and 1962, which money shall be expended for the maintenance of the Limestone Cemetery, owned by said association; and during the last six months of the year 1962, the Limestone Cemetery Association shall file a report to the court showing what progress has been made to obtain funds or services for the repair and maintenance of the cemetery. Costs of this proceeding to be paid by the petitioner.