2005 SD 68

Maria GAKIN and Frederick Eagle Tail, Jr., Plaintiffs and Appellants,

v.

CITY OF RAPID CITY, South Dakota, a Political Subdivision, Mt. View Cemetery, a Municipal Entity, and Tom Vallette, employee, and Jerry Zimmerman, employee, and John Does Three Through Five, Jointly, Severally and in their Individual Capacities, Defendants and Appellees.

No. 23348.

Supreme Court of South Dakota.

Argued March 22, 2005.

Decided June 1, 2005.

Robin L. Zephier of Abourezk & Zephier, Rapid City, South Dakota, Attorneys for plaintiffs and appellants.

Michael S. Booher, Assistant City Attorney and Jason E. Green, City Attorney, Rapid City, South Dakota, Attorneys for defendants and appellees.

SABERS, Justice.

[¶ 1.] Maria Gakin and Frederick Eagle Tail, Jr. filed suit alleging that cemetery employees moved the grave of their deceased infant son without their consent. The city of Rapid City (City), which owns and operates the cemetery, denies these accusations. The trial court granted the City's motion for summary judgment on all state claims based on failure to file notice of claim within 180 days pursuant to SDCL 3–21–2 and on all federal civil rights claims based on lack of liability. The parents appeal and we affirm Issues 1 and 3A and reverse Issues 2 and 3B.

## Facts

[¶ 2.] Maria Gakin (Gakin) and Frederick Eagle Tail, Jr. are the natural parents of a deceased infant, Ty Eagle Tail (Ty). Ty was born on July 27, 1999 with a severe genetic and physical impairment known as Anencephalus. Due to his medical condition, Ty passed away approximately two and one-half months after birth. Ty's parents hired Kirk Funeral Home to provide the funeral arrangements. This included a traditional Christian/Lakota funeral at St. Matthew's Episcopal Church in Rapid City, followed by a burial service at Mountain View Cemetery. The funeral and burial took place on October 15, 1999.

[¶ 3.] Within days after the funeral, the parents suspected that the grave site had been moved several feet from its original position. A month or two later, Gakin telephoned Thomas Vallette (Vallette), the cemetery supervisor, to discuss the matter. During the phone call, Gakin accused the cemetery of moving the gravesite without her permission. Vallette denied those accusations.

[¶ 4.] In September, 2001, almost two years after Ty's funeral, the parent's attorney contacted the cemetery in an effort to determine if the infant's grave site had been moved after the funeral and burial. The city attorney responded to the inquiry and explained that while preparing the gravesite the day before the funeral, cemetery employee Jerry Zimmerman (Zimmerman) mistakenly dug the grave in the wrong spot. The error was discovered by Vallette and the next morning he and Zimmerman filled-in the grave and dug a grave in the correct location prior to the funeral service later that afternoon.

[¶ 5.] Nonetheless, the parents remained suspicious and on May 9, 2002, they had Ty's remains disinterred. The disinterment confirmed that Ty's remains were in fact buried in his marked grave, but that the casket faced east rather than

west, the traditional manner.[1] The parents maintain that pictures taken at the funeral and at the disinterment, along with the positioning of the casket, show that it had been moved sometime after the funeral and burial.

[¶ 6.] The parents filed a Complaint against the city of Rapid City and certain unnamed defendants alleging negligence, reckless and intentional conduct, violation of contract, intentional and negligent infliction of emotional distress, trespass, failure to train and supervise cemetery employees, and punitive damages. On November 19, 2003, they amended the Complaint to include the specific named defendants, Vallette and Zimmerman, and added the claims of fraud, deceit and concealment. The trial court granted the City's motion for summary judgment on all state claims based on failure to file notice of claim within 180 days pursuant to SDCL 3–21–2 and on all federal civil rights claims based on lack of liability. The parents appeal raising three issues, which we rewrite as four issues:

1.  Whether the trial court erred in granting summary judgment on all state tort claims based on lack of notice under SDCL 3–21–2.

2.  Whether the trial court erred in granting summary judgment on all state contract claims.

3.  Whether the trial court erred in granting summary judgment on all federal civil rights claims under 42 USC § 1983 and § 1985.
    A.  Claims against the City
    B.  Claims against individuals

## Standard of Review

[¶ 7.] In reviewing a trial court's order granting a motion for summary judgment, "[w]e will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided." *Flugge v. Flugge*, 2004 SD 76, ¶ 5, 681 N.W.2d 837, 839–40 (citing *Luther v. City of Winner*, 2004 SD 1, ¶ 6, 674 N.W.2d 339, 343). "We view all reasonable inferences drawn from the facts in the light most favorable to the non-moving party." *Id.* "Questions of law are reviewed de novo." *In re Estate of Martin*, 2001 SD 123, ¶ 15, 635 N.W.2d 473, 476.

**[¶ 8.] 1. Whether the trial court erred in granting summary judgment on all state tort claims based on lack of notice under SDCL 3–21–2.**

[¶ 9.] SDCL 3–21–2 provides:

No action for the recovery of damages for personal injury, property damage, error, or omission or death caused by a public entity or its employees may be maintained against the public entity or its employees unless written notice of the time, place, and cause of the injury is given to the public entity as provided by this chapter *within one hundred eighty days after the injury.*

(emphasis added).

[¶ 10.] The parents argue that the trial court erred in granting summary judgment on all state tort claims based on lack of notice to the City within 180 days of the injury. Specifically, they assert three arguments. 1. That they did not know that the cemetery was owned and operated by the City and they were not aware of the 180–day notice rule. 2. That the date of the injury was the date that Ty's body was disinterred. 3. That the 180–day notice rule should have been tolled indefinitely due to

---

1.  Ken Kirk, the funeral director of Kirk Funeral Home, testified that it is Christian tradition to bury a deceased individual with their head to the west. However, according to Kirk, the disinterment revealed that Ty was buried with his head to the east.

fraudulent concealment on the part of the City.

### 1. Awareness of City Ownership and 180–day Notice Rule

[¶ 11.] The parents contend that they did not know that the City owned and operated Mountain View Cemetery and that they did not become aware of the 180–day rule until they acquired legal counsel approximately ten months after the funeral.

[¶ 12.] We find these arguments unpersuasive. The record indicates that a copy of the Certificate of Purchase for Ty's cemetery plot was provided to Fred Eagle Tail, Jr. by Kirk Funeral Home. This document clearly indicates that it was issued by the city of Rapid City.[2]

[¶ 13.] As to the 180–day notice rule, ignorance of the law is no excuse. "Mere ignorance of the law can never be considered a mistake upon which relief from the operation or effect of the law may be predicated." *Sherin v. Eastwood,* 32 S.D. 95, 101, 142 N.W. 176, 179 (1913).

### 2. Date of Injury

[¶ 14.] The parents argue that the accrual date of the 180–day notice rule should be May 9, 2002, the day they disinterred Ty's remains. They contend that up until that time, they could only speculate as to whether their son's grave was moved. It is their position that only after Ty's remains were disinterred did they actually know that his grave had been moved.

[¶ 15.] This Court has held that the statutory mandate in SDCL 3–21–2 is unambiguous:

When the time requirement of this statute has been in dispute, we have continuously held that the date of the injury is the triggering event for the 180–day period. *The statute clearly says, "after the injury," not "after the discovery of the injury."*

*Purdy v. Fleming,* 2002 SD 156, ¶ 14, 655 N.W.2d 424, 430 (emphasis added). *See also Peterson ex rel Peterson v. Burns,* 2001 SD 126, ¶ 39, 635 N.W.2d 556, 570 (stating that SDCL 3–21–2 is an example of a notice statute in which a plaintiff must give 180 days notice after the time of the injury); *In re Kindle,* 509 N.W.2d 278, 280 (S.D.1993) (stating that "[u]nder South Dakota law, no action for damages may be maintained against a public entity or official unless written notice of the injury is given to that entity within 180 days of the injury"); *Finck v. City of Tea,* 443 N.W.2d 632, 635 (S.D.1989) (holding that notice of tort claim to mayor or city finance officer is mandatory).

[¶ 16.] The date of Ty's funeral was October 15, 1999. Gakin testified that she started to suspect that the grave site had been moved within days after the funeral. Although the exact date of the conversation is unknown, the evidence shows that Gakin confronted Vallette about the situation a month or two after the funeral. She accused Vallette of moving Ty's grave and she did not believe him when he denied her accusations. Despite their ongoing suspicions, the parents waited approximately ten months before seeking legal advice. On September 27, 2001, almost two years from the date of the funeral, the parents' attorney sent a letter to the cemetery reiterating the parents' accusations and asking for an explanation. The City responded to the letter on Octo-

---

2. "CITY OF RAPID CITY" is printed across the top of the document and it is signed by both the mayor and city finance officer.

ber 9, 2001, denying any wrongdoing in the matter. On October 16, 2001, the parents filed their initial Complaint against the City. The following Spring, on May 9, 2002, the parents had Ty's remains disinterred.

[¶ 17.] By Gakin's own testimony and as stated by the parents' attorney in the letter to the City on September 27, 2001, the alleged misconduct was discovered by the parents within days after Ty's funeral.[3] Therefore, both the alleged injury and the discovery of the alleged injury occurred sometime during the time frame of October 15–17, 1999. It is undisputed that the parents failed to provide the City with written notice within 180 days from that time. In fact, at oral argument, the parents' attorney conceded that there was never any attempt to specifically provide written notice of the alleged claims in accordance with SDCL 3–21–2. It could be argued that notice was eventually provided to the City through either the letter from parents' attorney or the Complaint filed against the City. However, both events occurred approximately two years after the date of the alleged injury and do not satisfy the 180–day notice rule of SDCL 3–21–2.[4] Here, the injury, if any, occurred on the day of the funeral, October 15, 1999.

### 3. Fraudulent Concealment

[¶ 18.] "We have previously held that fraudulent concealment may toll the statute of limitations" and "this doctrine may be extended to a notice of claim provision." Purdy, 2002 SD 156, ¶ 18, 655 N.W.2d at 431 (internal citations omitted). The parents assert that the 180–day notice rule should have been tolled indefinitely because of the City's fraudulent concealment of their wrongdoings. Specifically, they allege that Vallette intentionally concealed their negligent activity by denying Gakin's accusations and by changing the grave number in the lot book.[5] The parents also claim that a "unique fiduciary relationship" exists between the parties because they have a significant property interest in their deceased son's remains, along with a "peculiar confidence" in the City not to disturb the remains.

[¶ 19.] This Court has held:

SD 89, ¶ 13, 566 N.W.2d 470, 474 (holding that "substantial compliance is sufficient to satisfy the notice requirements of SDCL 3–21–2 and –3"). However, SDCL 3–21–2 specifically provides that "written notice" must be given and SDCL 3–21–3(3) provides that in a case involving a municipality the written notice must be given "to the mayor or city finance officer." Therefore, this argument is unpersuasive since the phone conversation did not provide *written* notice and it did not involve either the mayor or the city finance officer.

---

3. When questioned about when she returned to the cemetery after Ty's funeral, Gakin testified as follows:

Q: Did you go to the cemetery again?
A: Yes. The day after, I went to pick up all his flowers, because we had taken all the flowers from the [Oyate Center]. And then the day after, we went and picked them up. And then two days later is when I seen that he was moved. I thought he was moved.

Furthermore, in the letter sent to the City, the parents' attorney stated:

It was learned within 48 hours after his burial on or about October 13, 1999[sic], that apparently, his body and casket were exhumed and moved to an adjacent grave site.

4. Although not argued by the parents, it could be asserted that "substantial compliance" of the notice requirement was achieved via the phone conversation between Gakin and Vallette. See Myears v. Charles Mix County, 1997

5. Kay Bretsch, an accounting clerk in the cemetery office, testified that several days after the funeral Vallette indicated to her that Zimmerman had "dug the wrong grave" and instructed her to change Ty's grave number in the cemetery's lot book. However, as indicated, Vallette claims he and Zimmerman already dug the grave in the correct location on the morning of the funeral.

In applying this doctrine to a particular set of facts, we first must determine whether a fiduciary relationship existed between the parties.

. . .

The existence of a fiduciary duty and the scope of that duty are questions of law for the court. Generally, in such a relationship, the "property, interest or authority of the other is placed in charge of the fiduciary." In *Garrett v. BankWest, Inc.,* we found that a "fiduciary relationship imparts a position of peculiar confidence placed by one individual in another." Normally, in a fiduciary relationship, one of the parties has a superior power over the other.

*Id.* (internal citations omitted).

[¶ 20.] In every contractual relationship, the parties place confidence in the other's promise to perform. However, a contractual obligation does not necessarily rise to the level of a fiduciary duty. *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 837–38 (S.D.1990) ("A fiduciary is in a position to have and exercise, and does have and exercise influence over another."); *Chem–Age Industries, Inc. v. Glover,* 2002 SD 122, ¶ 38, 652 N.W.2d 756, 772 ("Fiduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other."); *Buxcel v. First Fidelity Bank,* 1999 SD 126, ¶ 14, 601 N.W.2d 593, 597 ("A confidential relationship is generally synonymous with a fiduciary relationship."). Here, the parents purchased a cemetery lot along with perpetual maintenance services for $150. This created a contractual relationship. However, the parents did not relinquish control over confidential decision making inherent in fiduciary relationships. There is no evidence to suggest that the City was in a superior position to exercise influence over them as a result of their contractual relationship and there

was no confidential relationship. Therefore, no fiduciary relationship existed between the parties.

[¶ 21.] "Absent a confidential or fiduciary relationship, fraudulent concealment consists of 'some affirmative act or conduct on the part of the defendant designed to prevent, *and does prevent,* the discovery of the cause of action.'" *Roth v. Farner–Bocken Co.,* 2003 SD 80, ¶ 14, 667 N.W.2d 651, 660 (quoting *Strassburg v. Citizens State Bank,* 1998 SD 72, ¶ 14, 581 N.W.2d 510, 515) (emphasis added). In viewing the evidence in the light most favorable to the parents, Vallette's alleged fraudulent actions denying any wrongdoing and allegedly instructing Bretsch to change the grave number in the lot book may have constituted affirmative conduct designed to prevent the discovery of the cause of action. However, by Gakin's own testimony and as admitted in the letter that the parents' attorney sent to the City, within days after the funeral they suspected that the grave had been moved and those suspicions persisted despite Vallette's denial of any wrongdoing. Furthermore, the parents' suspicions were based largely on pictures taken at the funeral by family members. None of that photographic evidence was ever in the City's control. Therefore, since the parents suspected wrongdoing from the very beginning, did not believe or rely on Vallette's denials, and had photographic evidence which they assert prove their accusations, it cannot be said that Vallette's alleged fraudulent actions in fact *prevented* the parents from discovering the claimed cause of action.

[¶ 22.] Based on the above, the trial court did not err in granting summary judgment on all state tort claims based on lack of notice under SDCL 3–21–2. Therefore, we affirm Issue 1.

**[¶ 23.] 2. Whether the trial court erred in granting summary judgment on all state contract claims.**

[¶ 24.] "This Court has interpreted SDCL 3–21–2 as requiring notice of injury for all causes of action sounding in tort." *Wolff v. Secretary of S.D. Game, Fish, and Parks Dep't*, 1996 SD 23, ¶ 20, 544 N.W.2d 531, 534 (citing *Finck v. City of Tea*, 443 N.W.2d 632, 635 (S.D.1989)).

[¶ 25.] The parents contend that the rigid scheme of SDCL 3–21–2 should not preclude remedies for breach of implied and expressed contractual obligation because breach of contract is not a tort-based claim.[6] Contract claims carry a six-year statute of limitations. SDCL 15–2–13. Therefore, they assert that the matter should be remanded to the trial court on the breach of contract claims.[7]

[¶ 26.] "We have long recognized that '[c]onduct that is merely a breach of contract is not a tort.'" *Trouten v. Heritage Mutual Insurance Co.*, 2001 SD 106, ¶ 32,

632 N.W.2d 856, 864 (quoting *Weeg v. Iowa Mutual Insurance Co.*, 82 S.D. 104, 109–10, 141 N.W.2d 913, 916 (1966)). Consequently, the notice provisions of SDCL 3–21–2 do not apply to breach of contract claims. *Finck*, 443 N.W.2d at 635 (holding that it is not necessary to give notice pursuant to SDCL 3–21–2 on contract-based claims). Therefore, the trial court erred in granting summary judgment on the breach of contract claims for failure to comply with the notice provisions of SDCL 3–21–2. We reverse and remand for trial on Issue 2.

**[¶ 27.] 3. Whether the trial court erred in granting summary judgment on all federal civil rights claims under 42 USC § 1983 and § 1985.**

*A. Claims against the City*

[¶ 28.] The parents alleged a violation of their civil rights under 42 USC § 1983 (civil action for deprivation of rights) and

---

**6.** The parents also argue on appeal that their claim of trespass is not a tort-based claim and is not subject to SDCL 3–21–2. However, despite the parents' contention, a claim of trespass is commonly recognized as a tort-based claim. The Restatement (Second) Torts § 158 (1965) establishes liability for intentional trespass on land. Furthermore, Black's Law Dictionary defines an "intentional tort" as:

> A tort committed by someone acting with general or specific intent. Examples include battery, false imprisonment, and *trespass to land.*

BLACK'S LAW DICTIONARY 1497 (7th ed 1999) (emphasis added).

**7.** Although not argued in their brief, the City asserted during oral argument that the breach of contract issue was never pleaded nor raised at the motions hearings before the trial court and it should not be considered on appeal.

> "All pleadings shall be construed as to do substantial justice." SDCL 15–6–8(f). While it is accurate that neither the initial

Complaint nor the Amended Complaint contain the phrase "Breach of Contract" as a subheading, both documents contain language regarding the parent's contract claims. Specifically, paragraph 11 of both documents states in relevant part:

> 11. Within an unknown number of hours and/or days following the death and burial of said deceased, Defendants . . . allegedly tampered with the original gravesite of decedent, *in violation of the Plaintiff's burial agreement/contract with Defendants*
>
> . . . .

(emphasis added). References to the contract are also made in paragraphs 15, 33, 34, and 35 of both documents. Furthermore, pages 2–4 of the transcript from the motion hearing held on March 15, 2004, reveal that Circuit Court Judge Delaney was aware of the contract claims and questioned the attorneys about the issue. However, Judge Delaney ultimately failed to specifically rule on the contract claims as evidenced by his Findings of Fact and Conclusions of law.

§ 1985(3) (conspiracy to interfere with civil rights). The parents argue that they have a constitutionally recognized property interest in their deceased son's remains and that the City violated their own policies, rules, and regulations in moving Ty's remains without their consent. The trial court held that the City did not act with deliberate indifference to deprive the parents of any constitutionally protected interest and that there is no City custom, practice, or policy that can support liability for the parents' constitutionally based claims.

[¶ 29.] The United States Supreme Court has held that "although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 635 (1978). Therefore, "our first inquiry in any case alleging municipal liability under § 1983 is the question of whether there is a *direct causal link between a municipal policy or custom and the alleged constitutional deprivation*." *Darrow v. Schumacher*, 495 N.W.2d 511, 517 (S.D.1993) (emphasis in the original) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412, 424 (1989)). "It is well-settled that custom for the purpose of a section 1983 action must have the force of law by virtue of 'persistent practices' of state officials." *Eischen v. Minnehaha County*, 363 N.W.2d 199, 203 (S.D.1985).

[¶ 30.] Here, there is no evidence of any previous problems, "persistent practices," or even past allegations of misconduct by cemetery personnel to establish a *custom* on which to base the parents' § 1983 claim. The parents also fail to identify a specific City *policy* on which to base their § 1983 claim. Furthermore, although the parents assert that they have a "property interest" in the possession and control of their deceased son's body and casket, they fail to identify a "direct causal link" between the alleged constitutional violation (i.e., deprivation of property without due process) and any City policy or custom. Therefore, a claim of civil rights violations under § 1983 has not been established.

[¶ 31.] In addition,

[t]o state a claim under 42 USC § 1985(3), a plaintiff must plead 1) the existence of a conspiracy; 2) a purpose of depriving a person or class of persons of equal protection of the laws; 3) an act in the furtherance of the alleged conspiracy; and 4) an injury to person or property or the deprivation of a right or privilege granted to a United States citizen. *Additionally, a plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action."*

*Biby v. Board of Regents of the University of Nebraska at Lincoln*, 338 FSupp2d 1063, 1074 (D.Neb.2004) (internal citations omitted) (emphasis added). *See also Federer v. Gephardt*, 363 F.3d 754, 758 (8th Cir.2004) (holding that a claim under the equal protection section of section 1985(3) requires proof of class-based animus).

[¶ 32.] On appeal, the parents do not assert, nor is there any evidence in the record to suggest, that racial or other class-based animus existed on the part of

the City.[8] Therefore, a prima facie claim of civil rights violations under § 1985(3) has not been established.

[¶ 33.] Based on the above, there is no genuine issue of material fact that the parents established civil rights violations under 42 USC § 1983 or § 1985(3) against the City. Therefore, the trial court did not err in granting summary judgment in favor of the City.

### B. Claims against Individuals

[¶ 34.] In addition to alleging violations of their civil rights under 42 USC § 1983 and § 1985(3) against the City, the parents brought suit against Vallette, Zimmerman, and other unnamed City employees in their individual capacities. However, the trial court failed to address the claims against these individuals and instead focused solely on the civil rights claims against the City. This is evident from the trial court's Conclusions of Law, which provide in relevant part:

1. The *City* did not act with deliberate indifference to deprive the Plaintiffs of any constitutionally protected interest.

2. There is no *City* custom, practice, or policy that can support liability for Plaintiffs' constitutionally based claims.

(emphasis added). The trial court's Findings of Fact and Conclusions of Law failed to include the parents' civil rights claims against the individuals in their individual capacities. Therefore, we reverse and remand on Issue 3B so that the trial court can properly address the parents' civil rights claims against the individuals in their individual capacities.

[¶ 35.] GILBERTSON, Chief Justice and KONENKAMP, Justice, concur.

[¶ 36.] ZINTER and MEIERHENRY, Justices, concur in part and concur in result in part.

ZINTER, Justice (concurring and concurring in result).

[¶ 37.] I generally concur. However, I concur in result on Issue 1 because of the Court's conclusion that "no fiduciary relationship existed" between this public cemetery and the family of the person buried there. See supra ¶ 20. Contrary to the Court's opinion, a fiduciary relationship may exist. However, I would not reach the fiduciary relationship issue. I would not reach it because the parties have not adequately briefed the issue, and even if a fiduciary relationship existed, the parents' actual knowledge of their cause of action precluded their use of fraudulent concealment to toll the notice provision of SDCL 3-21-2.

[¶ 38.] Although the Court concludes otherwise, a fiduciary relationship may exist between a public cemetery and the families of the people that are buried there. We have specifically recognized that "in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary." *High Plains Genetics Research, Inc. v. J K Mill-Iron Ranch*, 535 N.W.2d 839, 842 (S.D.1995) (citing *Nelson v. WEB Water Development Ass'n, Inc.*, 507 N.W.2d 691, 698 (S.D.1993)). Certainly, once a decedent's remains are interred, they are within the physical charge, custody, and control of the cemetery management. Furthermore, it is generally recognized that "a cemetery corporation is usually orga-

---

**8.** Although the parents specifically plead a claim under 42 USC § 1985, they do not argue each separate element of the claim per the cited case law. Instead, they combined the § 1983 and § 1985 claims into one general argument pertaining to the alleged civil rights violations.

nized for a public rather than private purpose, and the cemetery management is in the nature of a trust." *State ex rel. Stephan v. Lane*, 614 P.2d 987, 993 (Kan. 1980) (citing *Carlock v. Ladies Cemetery Association*, 317 S.W.2d 432 (Mo. 1958); *Frank v. Kugler*, 121 N.J.Super. 589, 298 A.2d 291 (1972); *Dennis v. Glenwood Cemetery*, 96 N.J. Eq. 399, 130 A. 373 (1924); 14 C.J.S. [*Cemetaries* § 5 (1991)]). In fact, "[c]emetery . . . management has been held to be in the nature of a charitable, pious, or sacred trust." *In re Limestone Cemetery*, 24 Pa. D. & C.2d 281, 294-295 (PaQuarSess 1960). For these reasons, "a non-profit cemetery corporation and the individuals who control its activities . . . bear a fiduciary relationship not only toward lot owners and relatives of persons buried in the cemetery, but toward residents at large of the community." *Id.* at 294. (citation omitted).

[¶ 39.] However, we need not definitively ascertain the exact nature of that relationship in this case because the decedent's parents may not rely upon the doctrine of fraudulent concealment by a fiduciary. They may not rely upon that doctrine because "[f]raudulent concealment [only] tolls the statute of limitations until the claim is discovered or might have been discovered with reasonable diligence." *Strassburg v. Citizens State Bank*, 1998 SD 72, ¶ 14, 581 N.W.2d 510, 515 (citations omitted). Therefore, "[f]raudulent concealment will not toll the statute of limitations, no matter the nature of the concealment, if a plaintiff is already on notice of a cause of action." *Id.* ¶ 15. (citations omitted).

[¶ 40.] Here, the parents were on notice of their cause of action from the very beginning, and consequently, fraudulent concealment was an unavailable theory even if a fiduciary relationship existed. Because fraudulent concealment was an unavailable theory no matter what the nature

of the relationship of the parties, the notice provision in SDCL 3-21-2 barred the state tort claims. *Purdy v. Fleming*, 2002 SD 156, ¶ 21, 655 N.W.2d 424, 432.

[¶ 41.] MEIERHENRY, Justice, joins this special writing.