0935

William W. PATE, Jr., Individually and as Executor and Trustee under the Will of Alethea Fennell Pate, Appellant/Respondent, v. Stella Pate FORD, Wallace Fennell Pate, Jr., Dorothy Pate Bridgers, Alethea Beckham Pate, and John McDonald Pate, each individually as the living grandchildren of Alethea Fennell Pate; Jack H. Mitchell, III, as Guardian ad Litem representing a class composed of all unborn children of William W. Pate, Jr.; Stuart G. Anderson, Jr., as Guardian ad Litem representing a class composed of all unborn children of Wallace F. Pate; Ben G. Leaphart as Guardian ad Litem representing a class composed of Francis Bell Ford, III, and William Pate Ford, minors under the age of 14 years, individually and as representatives of a class composed of unborn great-grandchildren of Alethea Fennell Pate, Deceased, by Wallace Pate; and James M. Allison as Guardian ad Litem representing a class composed of unborn great-grandchildren of Alethea Fennell Pate, Deceased, by William W. Pate, Jr., Defendants, of whom all are Respondents/Appellants, except Stella Pate Ford, Wallace Fennell Pate, Jr., Dorothy Pate Bridgers, Alethea Beckham Pate,

and John McDonald Pate, who are Respondents; and William W. PATE, Jr., Individually and as Co-Executor and Co-Trustee under the Will of W. W. Pate, Appellant/Respondent, v. Wallace F. PATE, Individually and as Co-Executor and Co-Trustee under the Will of W. W. Pate; Stella Pate Ford, Wallace Fennell Pate, Jr., Dorothy Pate Bridgers, Alethea Beckham Pate, and John McDonald Pate, each individually as the living grandchildren of W. W. Pate; Jack H. Mitchell, III, as Guardian ad Litem representing a class composed of all unborn children of William W. Pate, Jr.; Stuart G. Anderson, Jr., as Guardian ad Litem representing a class composed of all unborn children of Wallace F. Pate; and Ben G. Leaphart, as Guardian ad Litem representing a class composed of Francis Bell Ford, III, and William Pate Ford, minors under the age of 14 years, individually and as representatives of a class composed of all unborn great-grandchildren of W. W. Pate, Deceased, by Wallace Pate; and James M. Allison as Guardian ad Litem representing a class composed of unborn great-grandchildren of W. W. Pate, Deceased, by William W. Pate, Jr., Defendants, of whom all are, Respondents/Appellants, except Wallace F. Pate, individually and as Co-Executor and Co-Trustee under the Will of W. W. Pate; Stella Pate Ford, Wallace Fennell Pate, Jr., Dorothy Pate Bridgers, Alethea Beckham Pate, and John McDonald Pate, Respondents.

(360 S. E. (2d) 145)

Court of Appeals

*James R. Gilreath, Vance B. Drawdy* and *Michael A. Ferry*, of *Horton, Drawdy, Ward & Johnson, P.A.*, Greenville, *for appellant-respondent.*

*R. David Massey* and *C. Vincent Brown*, of *Brown & Hagins, P.A.*, Greenville, and *C. Claymon Grimes, Jr.*, of *Grimes, Grimes & Lumpkin*, Georgetown, *for respondents-appellants.*

*Jack H. Mitchell, III*, of *Mitchell & Ariail, Stuart G. Anderson, Jr.*, of *Anderson & Fayssoux, Ben G. Leaphart*, of *Love, Thornton, Arnold & Thomason*, and *James M. Allison*, of *Mauldin & Allison*, Greenville, *Guardians ad Litem.*

Heard Nov. 12, 1986.

Reheard June 23, 1987.

Decided July 27, 1987.

BELL, Judge:

William W. (Billy) Pate, Jr., one of two sons of William W. Pate, Sr., and Alethea Fennell Pate, commenced separate actions as executor and trustee under the Wills of his parents to have the Wills construed. The defendants are Billy's brother, Wallace Fennell Pate, the five living grandchildren of Mr. and Mrs. Pate, and various guardians ad litem representing the interests of other descendants both born and unborn. The cases were consolidated and referred to the master in equity with authority to enter judgment. Various parties appeal from the judgment of the master construing the Wills. We reverse and remand.

Mrs. Pate executed her Will on October 23, 1973. Mr. Pate executed his on October 24, 1973. Both Wills were drafted by the same attorney. Many provisions in the two Wills are identical. It is clear from reading them that Mr. and Mrs. Pate each intended to follow a common plan in disposing of their respective estates. Both Mr. and Mrs. Pate subsequently executed codicils to their Wills.

Two sons were born of the marriage of Mr. and Mrs. Pate, Billy and Wallace. They had no other children.

Billy first married in 1954. He had no children by his first marriage, which ended in divorce in 1958. Billy remarried in 1959. The second marriage also ended in divorce in 1975.

Billy had no children of the second marriage, although his second wife had a daughter by her previous marriage. Billy married a third time in 1983. His third wife was thirty-two years old at the time of the hearing. To date, no children have been born of the third marriage. Billy has no adopted children.

Wallace first married in 1952. Of that marriage five children were born. All five of Wallace's children were known to Mr. and Mrs. Pate during their lives and all were born before the Wills were executed. Wallace's first marriage ended in divorce in 1970. He married his present wife in 1971. There are no children of the second marriage, but he has stepchildren by his second wife. Wallace has no adopted children. One of Wallace's daughters has two living children by her marriage.

Mr. Pate died on November 9, 1979, leaving an estate valued at approximately $1.6 million. Mrs. Pate died on October 21, 1983, leaving an estate valued at approximately $6.78 million.

Both Wills contain certain specific legacies and bequests. These are not in dispute. The controversy centers on the disposition of the remainder of the estate after the specific legacies are distributed.

The second codicil to Mr. Pate's Will devises and bequeaths the remainder of his estate to his Trustee in trust. The Trustee is to pay the net income of the estate to Mrs. Pate during her life. There follows this provision:

> (9) *Upon wife's death.* Upon the death of my wife, Alethea Fennell Pate, following my death, my Trustee shall divide the assets of the trust into three (3) equal parts and distribute and pay over such parts in accordance with the provisions for division and distribution under Paragraph (10).

Paragraph (10) reads:

> (a) One such equal share to my Trustee to hold in trust, administer and pay the net income thereof ... to my son Billy so long as he lives. On Billy's death, the trust shall terminate and, subject to the provisions herein with respect to payments to minors, my Trustee shall dis-

tribute the assets of the trust in equal shares *per stirpes* to my natural born grandchildren.

(b) One such equal share to my Trustee to hold in trust, administer and pay the net income thereof . . . to my son Wallace so long as he lives. On Wallace's death, the trust shall terminate and, subject to the provisions herein with respect to payments to minors, my Trustee shall distribute the assets of the trust in equal shares *per stirpes* to my natural born grandchildren.

(c) The other such equal share, subject to the provision herein with respect to payments to minors, in equal shares *per stirpes* to my natural born grandchildren.

Mrs. Pate's Will provides that upon her death, if her husband does not survive her, her Executors shall divide the net assets of her estate into three equal shares. She then directs distribution of the three equal shares in the same language *verbatim* as Paragraph (10) of Mr. Pate's Will quoted above. The residuary clause of Mrs. Pate's Will also disposes of her residuary estate in exactly the same way using exactly the same words.

## I.

The main issue before us is how the Trustee shall divide and distribute the estate under the terms of the Wills.

In construing a will, the purpose of the courts is to discover and give effect to the intent of the testator. *Fenzel v. Floyd*, 289 S. C. 495, 347 S. E. (2d) 105 (Ct. App. 1986). To ascertain that intent, the first resort is always to the language of the will itself. *Bagwell v. Alexander*, 285 S. C. 331, 329 S. E. (2d) 771 (Ct. App. 1985). Intent must be gathered from the instrument as a whole, giving consideration to the words the testator used, and reading them in the light of established principles of law. *King v. South Carolina Tax Commission*, 253 S. C. 646, 173 S. E. (2d) 92 (1970); *Gist v. Brown*, 236 S. C. 31, 113 S. E. (2d) 75 (1960).

In this case, the Wills direct that upon Mrs. Pate's death the estate shall be divided into three equal shares. For convenience, we shall refer to these shares as the "(a) share," the "(b) share," and the "(c) share." The (c) share is to be distributed immediately. The (a) and (b) shares are placed in trust to be distributed upon the deaths of Billy and

Wallace, respectively. Each share is to be distributed "in equal shares *per stirpes* to my natural born grandchildren."

## A.

The five grandchildren contend, and the master agreed, that the term "my natural born grandchildren" means the five children of Wallace who were alive when the Wills were made and who wre the only grandchildren known to the Pates during their lifetimes. They reach this conclusion primarily by arguing family history and other evidence outside the four corners of the Wills. We reject their interpretation because it is contradicted by the language of the Wills themselves. Accordingly, we reverse the master.

We word "grandchildren" denotes a relationship between an ancestor and a certain class of his descendants, viz., lineal descendants of the second degree, and applies equally to all persons who bear that relation. *DeVeaux v. DeVeaux*, 20 S. C. Eq. (1 Strob.) 283 (1847). Where the term is used in a will, it includes after born grandchildren on the principle that all who answer the description of the class to whom the devise is made at the time the gift vests in enjoyment are entitled to take. *South Carolina National Bank of Chaleston v. Johnson*, 260 S. C. 585, 197 S. E. (2d) 668 (1973); *Dukes v. Shuler*, 185 S. C. 303, 194 S. E. 817 (1938). A limitation to "natural born grandchildren" restricts the gift to those related to the ancestor by blood; adopted or step grandchildren are excluded. *Turner v. Turner*, 260 S. C. 439, 196 S. E. (2d) 498 (1973); *Bagwell v. Alexander, supra.*

Reading the Wills as a whole, it is clear the Pates used the word "grandchildren" in its ordinary sense to denote the class of all natural born grandchildren, not merely the five children of Wallace *in esse* at the time the Wills were executed. If the Pates intended to restrict the gift to grandchildren living when the Wills were made, they easily could have named them individually or have used terms such as "my five grandchildren," "my grandchildren now living," "Wallace's five children," and the like.

It is apparent from other clauses of the Wills that the Pates knew how to limit a bequest to particular grandchildren. Elsewhere, Mr. Pate provides that if his wife predeceases him, his residence and personal effects go to

Wallace, with a gift over to "his children." Mrs. Pate bequeaths her home furnishings at her death to her grandchildren "then living." These provisions show the Pates knew how to exclude after born grandchildren.

The overall plan of disposition under the Wills shows a purpose to benefit the grandchildren as a group rather than to prefer particular individuals. Throughout the Wills it is clear the Pates intended to treat all grandchildren alike. Nowhere is anything left to individual grandchildren. Reading the Wills as a whole, the Pates consistently show class mindedness in providing for their grandchildren. Additionally, both Wills contain detailed directions in the event there are minor beneficiaries at the time of distribution. These provisions also indicate the Pates contemplated the possibility of after born grandchildren.

We, therefore, hold the term "natural born grandchildren" denotes a class gift to all grandchildren, including after born grandchildren, and not merely a gift to the five individuals living when the Wills were executed.

### B.

While Billy agrees the gift to "grandchildren" is a class gift, he argues that the limitation "in equal shares *per stirpes*" calls for a stirpital rather than a per capita division among the grandchildren. In other words, if Billy and Wallace have children living when either of them dies, the share to be distributed must be divided into two parts with half going to the children of Billy in equal shares and half going to the children of Wallace in equal shares. We also reject this interpretation as being against the expressed intention of the Pates.

The words "in equal shares" normally indicate a per capita division is intended. *Dukes v. Faulk*, 37 S. C. 255, 16 S. E. 122 (1892). If the Pates had said, "in equal shares to my grandchildren," there would be little doubt the grandchildren were to take per capita. However, they added the words "per stirpes" to the limitation. Thus, it is necessary to consider the import of the phrase "in equal shares *per stirpes.*"

The term "per stirpes" means by roots or stocks. It is a term of art taken from the law of descent and distribution and denotes the method of dividing an

intestate estate so that a class of distributees takes the share their immediate ancestor would have taken had he not predeceased them. *Irvin v. Brown,* 160 S. C. 374, 158 S. E. 733 (1931); *Walsh v. Friedman,* 219 N. C. 151, 13 S. E. (2d) 250 (1941). Strictly speaking, those who take per stirpes take by right of representing their ancestor and not as individuals in their own right. *Hungerpiller v. Keller,* 192 S. C. 329, 6 S. E. (2d) 741 (1940).

Legal terms are deemed to be used in their technical sense, unless it is evident from the will itself that they are differently employed. *Green v. Green,* 210 S. C. 391, 42 S. E. (2d) 884 (1947); *Landrum v. Branyon,* 161 S. C. 235, 159 S. E. 546 (1931). As used in a will, "per stirpes" may have different meanings, depending on the context in which it is used. The common, and technically correct, usage is with respect to a gift over to substituted beneficiaries in case of the death of a primary beneficiary. *See Irvin v. Brown, supra.* In this sense, the term has no meaning when applied to named individuals or members of a designated class who take as primary beneficiaries. *See Black v. Gettys,* 238 S. C. 167, 119 S. E. (2d) 660 (1961); *Irvin v. Brown, supra.* It is a term of limitation applying to substituted, not primary, beneficiaries. However, "per stirpes" may be, and sometimes is, used in other senses.

When used as a limitation on a class gift to primary beneficiaries, the words "per stirpes" may indicate an intention to make the share of each primary beneficiary descendible to remoter generations by right of representation. *See Vale Royal Manufacturing Co. v. Santee River Cypress Lumber Co.,* 84 S. C. 81, 65 S. E. 955 (1909); *Gourdin v. Deas,* 27 S. C. 479, 4 S. E. 64 (1887); Restatement of Property § 285(2)(d) & comment k (1940). Thus, a gift to "my issue per stirpes" is a gift to immediate issue only, with remoter issue taking by right of representation the share of a deceased ancestor. *Vale Royal Manufacturing Co. v. Santee River Cypress Lumber Co., supra; Gourdin v. Deas, supra.* Similarly, a limitation "to my children per stirpes" allows descendants of a deceased child to take his share by representation. *Black v. Gettys, supra;* Restatement of Property § 285 comment k (1940). It is in this latter sense that the Pates used "per stirpes" in their Wills.

The general rule is that where there is a gift to a class at a certain time or upon the happening of a certain event, only those in existence at that time can take; the predeceased ones or their representatives are excluded. *In re Warren's Will*, 176 S. C. 55, 180 S. E. 458 (1935); *Dickson v. Dickson*, 23 S. C. 216 (1885).

Thus, if the Pates had used the words "in equal shares to my natural born grandchildren" without futher limitation, only those grandchildren *in esse* when the estate vested in enjoyment would have taken. Predeceased grandchildren and their representatives would have been excluded. By adding the words "per stirpes," the Pates insured that if any grandchild died before distribution his share would pass to his children per stirpes, maintaining equality of treatment among the grandchildren's generation. On the other hand, if they had used the words "per stirpes to my natural born grandchildren" without further limitation, "per stirpes" might have been treated as meaningless or as calling for a stirpital division among the grandchildren, again destroying equality of treatment among the grandchildren's generation.

By using the exact words they did, the Pates were careful to insure that when the three shares of the estate were distributed, they would be divided equally among the branches of the family represented by the grandchildren.

This interpretation accords with the use of "per stirpes" in other parts of the Wills. For example, Mr. Pate makes a gift over of his residence and personal effects to Wallace's children "per stirpes." Since the gift is to Wallace's children only, Mr. Pate obviously does not mean the property should be divided in half with the descendants of Billy taking his share and the descendants of Wallace taking his, "per stirpes." The whole property clearly goes to Wallace's children. "Per stirpes" can only have been added to cover the case of a predeceased child. If one of Wallace's children dies before distribution, Mr. Pate is directing the deceased child's share should pass to his descendants by right of representation, thereby maintaining equality of treatment among Wallace's children. Wherever it appears, "per stirpes" is used in this sense throughout both Wills.

## C.

We turn now to the question of how the Trustee ■ should divide and distribute the estate.

Under the terms of the Wills, distribution of shares (a), (b), and (c) is to occur at different times. As to each share, therefore, the class of beneficiaries will not close until the time fixed for distribution. *See South Carolina National Bank of Charleston v. Johnson, supra.* Nevertheless, the law favors vesting of estates at the earliest time possible. *Id.* Since there is no requirement under the Wills that a grandchild must survive until the time of distribution in order to take, the shares of the five grandchildren living at Mrs. Pate's death vested immediately, subject to the class opening to admit after born grandchildren, who will take vested interests as they are born. *Id.* If any grandchild dies before distribution, his vested interest will descend to his heirs who will take as representatives of their deceased ancestor. *Id.*

Applying these principles in accordance with the terms of the Wills, the Trustee should divide and distribute the Pates' estate as follows.

The (c) share should be distributed upon the death of Mrs. Pate. At her death, the class of persons taking the (c) share closed. There were five natural born grandchildren living at Mrs. Pate's death and no grandchild had predeceased her. Thus, the (c) share should be divided into five equal shares with each grandchild taking one share.

The (a) share should be distributed upon Billy Pate's death. Each grandchild living at Mrs. Pate's death has a vested interest in the (a) share, subject to the class opening to admit after born grandchildren. At the death of Billy Pate, the class of persons taking the (a) share will close. The (a) share should then be divided equally among the grandchildren according to the number of their vested interests, with the children of any grandchild who predeceases Billy taking their parent's share by representation.

The (b) share should be distributed upon Wallace Pate's death. Each grandchild living at Mrs. Pate's death has a vested interest in the (b) share, subject to the class opening to admit after born grandchildren. At the death of Wallace Pate, the class of persons taking the (b) share will close. The (b) share should then be divided equally among the grand-

children according to the number of their vested interests, with the children of any grandchild who predeceases Wallace taking their parent's share by representation.

The parties brief a number of issues relating to extrinsic evidence the master considered in construing the Wills. Since the Wills, read as a whole in the light of established principles of law, are unambiguous, the master erred in admitting extrinsic evidence of the Pates' intent. *Scaife v. Thomson*, 15 S. C. 337 (1880) (as a general rule parol evidence is not admissible in the construction of a will). As we are reversing the judgment for the reasons stated above, it is unnecessary to discuss the evidentiary issues in detail.

## II.

The second issue is whether the (b) share of Mrs. Pate's estate should be distributed forthwith to the five grandchildren now living. This issue arises because Wallace disclaimed all interest under his mother's Will by executing a formal instrument of disclaimer on June 28, 1984. The master held Wallace's disclaimer accelerated the grandchildren's remainder interest and ordered an immediate distribution of the (b) share. We reverse.

Where the beneficiary of an express trust disclaims his interest, the express trust fails and the trustee generally will be deemed to hold the property upon a resulting trust for the settlor or his estate. *Jervis v. Wolferstan*, (1874) 18 Eq. 18; Restatement (Second) of Trusts § 411 & comment g (1959). A resulting trust will not arise, however, if the settlor intends a different disposition of the property upon failure of the express trust. *Sidney v. Shelly*, (1815) 19 Ves. 352; *Dexter v. President & Fellows of Harvard College*, 176 Mass. 192, 57 N. E. 371 (1900); Restatement (Second) of Trusts § 412.

As a corollary of the last mentioned rule, where property is placed in trust for one beneficiary for life with a remainder to another, if the express trust fails as to the life interest, a resulting trust in favor of the settlor does not arise. Instead, the remainderman is entitled to immediate enjoyment of the property if, under the terms of the trust, the only reason for postponing enjoyment of the remainder interest is to allow the life beneficiary to enjoy his

interest. *Key v. Weathersbee*, 43 S. C. 414, 21 S. E. 324 (1895); *Keesler v. North Carolina National Bank*, 256 N. C. 12, 122 S. E. (2d) 807 (1961). In such cases, there is said to be an "acceleration" of the remainder. *Id.* If all remainder interests have vested, there is no reason, once the life beneficiary is barred, to postpone enjoyment of the estate until the life beneficiary dies. *Key v. Weathersbee, supra.* On the other hand, if, by the terms of the trust, the remaindermen are to be determined at the death of the life beneficiary, enjoyment of the remainder interest will be postponed until the death of the life beneficiary, when all the remaindermen can be ascertained. *Carrick v. Errington*, (1726) 2 P. Wms. 361; *United States Trust Co. of New York v. Douglass*, 143 Me. 150, 56 A. (2d) 633 (1948); *Trenton Banking Co. v. Hawley*, 7 N. J. Super. 301, 70 A. (2d) 896 (1950); *Keesler v. North Carolina National Bank, supra.*

Similarly, as a general rule, where all the actual or possible beneficiaries of a trust are in existence and sui juris, they may join together to put an end to a trust. *Anson v. Potter*, (1879) 13 Ch. Div. 141. However, a trust may not be terminated unless all interests have vested. *Wachovia Bank & Trust Co., N. A. v. Sevier*, 41 N. C. App. 762, 255 S. E. (2d) 636, *review denied*, 298 N. C. 304, 259 S. E. (2d) 305 (1979). The court will not permit a trust to be destroyed where the rights of unborn remaindermen will be injuriously affected. *Bettis v. Harrison*, 186 S. C. 352, 195 S. E. 835 (1938); *Dumas v. Carroll*, 112 S. C. 284, 99 S. E. 801 (1919). In such circumstances, it is the court's duty not to allow the parties to alter or destroy the trust. *Bettis v. Harrison, supra; Dumas v. Carroll, supra.* If possible beneficiaries may later come into existence, a life tenant cannot by relinquishing his interest terminate the trust. *Cf. Folk v. Hughes*, 100 S. C. 220, 84 S. E. 713 (1915).

Applying these principles to the present case, we hold Wallace's disclaimer does not operate to accelerate the remainder. All those who are to take a remainder interest in the (b) share of the estate cannot be ascertained until the death of Wallace. To terminate the trust before all possible remainder interests have vested would destroy the rights of unborn grandchildren to an equal share in the estate. In effect, Wallace would be able to defeat the intent

of the testatrix by the unilateral act of disclaiming his life interest.

Mrs. Pate intended distribution to be at Wallace's death. The Will so states. She intended her natural born grandchildren at Wallace's death to share in the estate equally. To accelerate the remainder interest and thereby cut off the rights of after born grandchildren would override the express provisions of her Will.

The master relied on *Key v. Weathersbee, supra*, to accelerate the remainder interest. That case is distinguishable. The devise was to named tenants for life with the remainder to three named individuals. Because the life tenants could not take, the Court held the remainder interest was accelerated and the remaindermen took immediately. Unlike this case, however, no other remainder interests could possibly vest before the death of the life tenant; all interests that could vest had vested.

The master also relied on Section 21-37-50(a), Code of Laws of South Carolina, 1976, as amended, to accelerate the remainders. The statute provides, in pertinent part:

> If a person becomes entitled to an interest in property because of the death of a decedent including . . . a testator . . . and the person disclaims the interest, the interest devolves . . . as if the person predeceased the decedent, unless the instrument governing the devolution . . . of the interest contains another disposition thereof in the event of a disclaimer. . . .[1]

The Will provides for distribution of the (b) share to the grandchildren "on Wallace's death." This provision, read in the light of applicable law, prevents the remainder interest

---

[1] This statute became effective on June 15, 1983. It was subsequently repealed by Act No. 539, Acts and Joint Resolutions of the General Assembly of South Carolina, 1986, effective July 1, 1987. 64 Stat. at Large 3446, 3973. The declared legislative intent is to ensure the ability of persons to disclaim interests in property without the imposition of federal and state estate, inheritance, gift, and transfer taxes; and the Legislature has directed the statute to be construed in accordance with that intent. Section 21-37-10, Code of Laws of South Carolina, 1976, as amended. There is no indication the Legislature intended the statute to overturn the settled principles protecting unborn remaindermen outlined above. The statute was enacted solely to alter the tax consequences of disclaimers of interest and is clearly subject to the qualification that if the testator intends a different disposition, the testator's intent, not the statute, governs devolution.

from being distributed until Wallace dies, even if he disclaims his life interest. In other words, in the language of the statute, the instrument governing devolution contains "another disposition" of the remainder interest in the event of a disclaimer. For this reason, the statute, by its own terms, does not accelerate the remainder.

We reject the argument that the statute required Mrs. Pate to make express provision for a disclaimer by Wallace. As long as the legal effect of her Will was to postpone distribution of the remainder interest until Wallace's death the Will provided for a different disposition from the statute and Mrs. Pate was entitled to rely on the statutory exception in favor of carrying out the testator's intent.

### III.

Since the (b) share cannot be distributed until Wallace's death, it is necessary to decide what becomes of the income during Wallace's life. Billy Pate argues the income should be treated as part of the residuary estate to be distributed in accordance with the residuary clause of Mrs. Pate's Will. The five grandchildren contend the income should be paid periodically to the natural born grandchildren of Mrs. Pate until Wallace dies and the corpus is distributed.

We are called upon to determine the disposition of the income that most nearly carries out what the testatrix would have wished under the circumstances. *New Haven Bank v. Hubinger,* 117 Conn. 417, 167 A. 914 (1933); *Fidelity & Columbia Trust Co. v. Cornett,* 277 Ky. 619, 126 S. W. (2d) 1079 (1939); *Amoskeag Trust Co. v. Haskell,* 96 N. H. 89, 70 A. (2d) 210, *rehearing denied and opinion modified,* 96 N. H. 130, 71 A. (2d) 409 (1950). In other words, we must decide what disposition most nearly conforms to the plan of distribution set forth in the Will.

### A.

Mrs. Pate's Will does not expressly mention a disclaimer of the (b) share income by Wallace. However, the succession clause of the Will provides a key to the disposition she would have wished in the circumstances.

Mrs. Pate foresaw Wallace's income trust might fail because of his death. She, therefore, provided:

*Succession.* If my son Billy is not living at the time for distribution to him, his share of my estate shall go to Wallace if he is living, otherwise in equal shares *per stirpes* to my natural born grandchildren. If my son Wallace is not living at the time for distribution to him, his share of my estate shall go in equal shares *per stirpes* to my natural born grandchildren.

This clause indicates that if the income trust failed Mrs. Pate wished her natural born grandchildren to take the income Wallace would have received as his share of the estate. Whether the income trust terminated by reason of Wallace's death or some other event, such as his disclaimer, seems less material than that the grandchildren should receive his share if he did not take. Throughout both Wills, Mr. and Mrs. Pate consistently provide that if Wallace does not take, his interest should go directly to the grandchildren. Our duty is to give effect to this clearly expressed plan of distribution.

The same result is also mandated by the disclaimer statute. Section 21-37-50(a) states that when a person disclaims his interest under a will, the interest devolves as if that person had predeceased the decedent unless the will contains another disposition of the interest in the event of a disclaimer. If Wallace had predeceased Mrs. Pate, the Will provides his interest would have gone in equal shares *per stirpes* to Mrs. Pate's natural born grandchildren. The Will contains no other disposition of Wallace's interest in the event of his disclaimer.[2]

Accordingly, we hold the income from the (b) share should be paid to Mrs. Pate's natural born grandchildren during Wallace's lifetime. The trustee should make the payments not less often than quarterly in equal shares to the natural born grandchildren then *in esse,* with the children of any grandchild who predeceases Wallace taking their parent's share by representation.

---

[2] There is no inconsistency in applying the disclaimer statute to determine disposition of the income of the (b) share, but not the corpus. The Will provides "another disposition" for the corpus, but not for the income. This difference justifies a different application of the statute to the different interests.

## B.

Billy Pate argues that Wallace's disclaimer creates a resulting trust in favor of Mrs. Pate's estate, so that the income from the (b) share should pass under the residuary clause of her Will. This argument is untenable for several reasons.

First, a resulting trust does not arise if the will shows the testator intended a different disposition. *Sidney v. Shelly, supra; Dexter v. President & Fellows of Harvard College, supra;* Restatement (Second) of Trusts § 412. As we have already discussed, the Pates consistently provided in both Wills that Wallace's share should go to the grandchildren if he did not take. Consequently, there is no reason to treat Wallace's income interest as part of the residuary estate.

Second, passing Wallace's interest under the residuary clause would create an intestacy as to one third of the income. The residuary clause follows *verbatim* the other provisions of the Will directing the trustee to divide the estate equally into (a), (b), and (c) shares with the income of the (b) share to be paid to Wallace for life. Since Wallace has disclaimed his interest under the residuary clause, there would be an intestacy as to that interest. *See Padgett v. Black*, 229 S. C. 142, 92 S. E. (2d) 153 (1956) (generally a lapsed legacy falls into residuum, but where lapsed legacy is part of residuum itself, it is distributed as intestate property). The law abhors intestacy and there is a presumption against intestacy as to any part of a testamentary trust. *Leathers v. Leathers*, 239 S. C. 94, 121 S. E. (2d) 354 (1961); *Spell v. Traxler*, 229 S. C. 466, 93 S. E. (2d) 601 (1956). The rule that an interest which has been renounced passes under the general residuary clause is itself founded upon the presumption against partial intestacy. *Watson v. Wall*, 229 S. C. 500, 93 S. E. (2d) 918 (1956). Thus, Billy's argument stands the rule on its head. Instead of using the residuary clause to avoid an intestacy, he would use it to create an intestacy. This not only defeats the purpose of the rule, but would also defeat the testatrix's plan of distribution in this case.

Third, passing Wallace's income interest under the residuary clause would give Billy one half of the income of the (b) share of the estate in addition to all the income of the (a) share during the joint lives of him and Wallace. This result

is clearly contrary to Mrs. Pate's intention. The Will consistently restricts Billy's interest to the life income from a one third share of the estate. It carefully excludes Billy from any greater interest. By contrast, in addition to their respective interests in one third of the estate, Wallace and the grandchildren are given other property under the Will. Billy is specifically excluded from these gifts. Similarly, although Wallace succeeds to Billy's income interest in the (a) share if Billy dies first, Billy does not succeed to Wallace's income interest in the (b) share if Wallace dies first; instead it goes directly to the grandchildren. These provisions and others manifest a clear intent that Billy should not receive more than his life income interest in one third of the estate. To enlarge Billy's share by passing Wallace's disclaimed interest under the residuary clause would defeat the testatrix's intention.

For these reasons, we conclude the income of the (b) share should not be distributed under the residuary clause.

## IV.

The final issue concerns an election given to Wallace and his children by Mrs. Pate's Will.

A major asset of the estate is a tract of land lying between Pelham Road and I-385 in Greenville County. This tract includes the Pates' home place, a 13.1548 acre parcel known as Patewood. The tract is prime development property. Mrs. Pate's Will provides that the home place should be included in Wallace's share of the estate, unless he elects not to receive it. If Wallace elects not to receive it, it is to go to Wallace's children as part of their distributive share, unless they unanimously elect otherwise. If at any time before final distribution of the estate it becomes necessary to sell the home place, Wallace is given first option to purchase it at its appraised value. If Wallace elects not to purchase it, then his children are given the option to purchase the home place at its appraised value.

Both Wallace and his children elected not to have the Pelham Road tract included as part of their distributive shares of the estate. Wallace also disclaimed his option to purchase Patewood. Thereafter, his children unanimously

elected to exercise their option to purchase Patewood from the estate. Billy agreed to their exercise of the option.

The main issues in controversy are (1) when the property should be paid for and (2) at what price.

The master held Wallace's children could pay for the property at the value listed in the warrant of appraisement filed with the probate court at Mrs. Pate's death. Furthermore, he gave them until the time of "final distribution" of the estate under item 7 of Mrs. Pate's Will to make payment. As we read it, this would permit Wallace's children to postpone payment until the later of Billy's or Wallace's death. We reverse.

Since Wallace and his children both elected not to have Patewood included in their distributive shares under the Will, it is necessary to sell Patewood pursuant to the option before the estate can be divided into three equal shares for purposes of distribution. All the parties appear to agree on this point. Therefore, we hold Patewood should be sold prior to the division of the estate into three equal shares under item 7 of Mrs. Pate's Will.

The Will states that Wallace's children are to purchase the home place "at its appraised value." "Appraised value" usually means "fair market value" or the price property will bring on the market after reasonable efforts to find a buyer who would give the highest price for it. *See Estate of Blouin*, 490 A. (2d) 1212 (Me. 1985); *McAdams v. Bolsinger*, 57 Ohio Op. 338, 129 N. E. (2d) 878 (P. Ct. 1950); *cf. Housing Authority of City of Charleston v. Olasov*, 282 S. C. 603, 320 S. E. (2d) 478 (Ct. App. 1984) ("fair market value" is price willing buyer will pay willing seller, neither being under compulsion to buy or sell and both being fully informed as to all uses of property); Section 62-3-707, Code of Laws of South Carolina, 1976, as amended (appraisers to ascertain fair market value of decedent's assets).

The parties do not dispute that Wallace's children should pay fair market value for the home place. Rather, they differ as to the time when fair market value should be determined. Wallace's children contend "appraised value" should be taken to mean the value listed in the warrant of appraisement filed with the probate court, i.e., fair market value at

the time of Mrs. Pate's death. The guardians representing the unborn grandchildren assert "appraised value" means fair market value at the time the home place is sold.

The Will expressly contemplates two contingencies with respect to the option on the home place: (1) that the option might not be exercised for a long time after Mrs. Pate's death; and (2) that all or portions of the property might be developed or sold before the option is exercised. Surely Mrs. Pate recognized the probability that the value of the home place would appreciate if these contingencies occurred. Nothing in the Will suggests she intended the price to Wallace's children to be fixed at her death and not to change with increases in the value of the property. On the contrary, her use of the term "appraised value" indicates the property should be purchased at a fair price, not a windfall price. Accordingly, we hold the term "appraised value" means the value set by competent, disinterested appraisers as of the time of purchase, not the time of Mrs. Pate's death.

The parties have raised additional minor issues on this appeal. We have reviewed them carefully and find them to be manifestly without merit. No purpose would be served by burdening an already lengthy opinion with the full discussion of these additional exceptions.

For the reasons stated, the judgment is reversed and the case remanded for further proceedings consistent with this opinion.

Reversed and remanded.

CURETON, and GOOLSBY, JJ., concur.