#23843-a-SLZ

**2006 SD 74**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE ESTATE OF
MERRITT A. SEEFELDT, SR.,
DECEASED

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CLARK COUNTY, SOUTH DAKOTA

* * * *

HONORABLE RONALD K. ROEHR
Judge

* * * *

GARY W. SCHUMACHER
TODD D. WILKINSON of
Wilkinson & Wilkinson
DeSmet, South Dakota

JONATHAN K. VAN PATTEN                    Attorneys for appellant
Vermillion, South Dakota                  Estate.

ROGER W. ELLYSON
Roger W. Ellyson, P.C.                     Attorney for appellee
Watertown, South Dakota                   Melanie Smith.

* * * *

CONSIDERED ON BRIEFS
ON APRIL 24, 2006

OPINION FILED **08/09/06**

#23843

ZINTER, Justice

[¶1.]     Testator's Last Will and Testament granted his three sons an option to purchase certain farm land from the Estate. The will "suggested" that one or all of three friends (two neighbors and an attorney) would appraise the land to determine the option price. The two neighbors ultimately appraised the land on a cash flow basis. Testator's daughter objected and submitted a fair market value appraisal from an independent, professional appraiser. The circuit court sustained the daughter's objection and adopted the professional appraiser's fair market valuation. The Estate appeals. We affirm.

## Facts and Procedural History

[¶2.]     Merritt A. Seefeldt, Sr. (Testator) farmed in Clark County, South Dakota. Testator had three sons and one daughter: Merritt Jr., Michael, Marshall, and Melanie Smith. Testator executed his Last Will and Testament on November 10, 1980, and executed a codicil to that will on December 15, 1982. On December 25, 2003, Testator died, survived by his wife and four children.

[¶3.]     Testator's will named Marshall as the personal representative. The will also granted his three sons an option to purchase farm land that Testator had acquired from his parents. "Item IV" of the will provided:

> As to such other real property that I may own at the time of my decease, the property that I have acquired from my father, August C., and my mother, Jessie B. Seefeldt, it is my desire remain in the Seefeldt family. I prefer that it be purchased by my sons, who have operated it for many years, but in considering the appraisal of that property, my sons, together with myself have constructed feed lots and improvements on said property, which should be deducted from the value thereof prior to the appraisal, it should then be offered for sale to my sons, Merritt, Jr., Michael and Marshall for the appraised

-1-

valuation, and they would become the owners thereof, upon payment to my daughter, Melanie Smith, a one-fourth interest therein. They shall have the privilege of installment purchase of her interest, paying to her one-tenth of her principal and interest annually, interest at the rate presently paid on passbook savings in the local banks at Clark on the unpaid balance. My Executor would be authorized to execute an Executor's Deed, issuing same to my sons on the purchase thereof, with a Note and Mortgage in favor of my daughter, pursuant to said terms.

*I would suggest that my Executor use one or all of the following appraisers, if I have not disposed of this land prior to my decease, and it is necessary to appraise same: my friends and neighbors, Jack Bailey and Alfred Overlie, and my friend and attorney, Ellsworth F. Wilkinson of De Smet, South Dakota.* If, of course, I have already conveyed the property, then the Executor can use such appraiser as he desires.

[¶4.]    Following Testator's death, Marshall selected Jack Bailey and Alfred Overlie to appraise the property for the sale to the sons. Bailey appraised the land at $140,400 ($351 per acre). Overlie appraised the land at $139,600 ($349 per acre). Ellsworth Wilkinson, the Estate's attorney, did not appraise the property, but he did "sign off" on Bailey's and Overlie's appraisals.

[¶5.]    Marshall subsequently filed an inventory of Testator's property. The inventory listed the "fair market value" of the land in question at $140,000 ($350 per acre). Melanie objected to this valuation and, at trial, called Allan Engstrom as an expert witness. Mr. Engstrom was an experienced and disinterested professional appraiser. According to Mr. Engstrom, the land's fair market value was $290,000 ($725 per acre) with or without the feedlots and other excluded improvements.[1]

---

1.    Testator specified in Item IV that these improvements were not to be included in the option price valuation.

[¶6.]     The circuit court concluded that Testator intended the land to be valued at its fair market value. After considering all of the evidence, the court further determined that Mr. Engstrom's appraisal most accurately represented the land's fair market value. The Estate appeals, presenting the following issues:

> 1) Whether the circuit court erred in concluding that the land was to be appraised at its "fair market value" despite the will's provision suggesting that certain friends act as appraisers to determine the option price.

> 2) Whether either party is entitled to appellate attorney's fees.

**Decision**

[¶7.]     The issue in this case involves the interpretation of Testator's will. We review the interpretation of a will under the de novo standard of review, with no deference given to the circuit court's interpretation. *In re* Estate of Brownlee, 2002 SD 142, ¶13, 654 NW2d 206, 210.

[¶8.]     The primary goal in interpreting a will is to determine the testator's intent. *Id.* ¶16 (citation omitted). In determining testamentary intent, "[a]ll the words and provisions appearing in [a] will must be given effect as far as possible, and none should be cast aside as meaningless." *Matter of* Estate of Jetter, 1997 SD 125, ¶20, 570 NW2d 26, 31 (quoting *In re* Estate of Bock, 85 SD 113, 115, 177 NW2d 734, 735 (1970)). "If the intent is clear from the language used, that intent controls." *In re* Estate of Martin, 2001 SD 123, ¶20, 635 NW2d 473, 477. "If doubt exists as to the testator's intent, 'the language used and the circumstances surrounding the execution of the writing will again be examined in light of pertinent rules of construction.'" *Estate of Brownlee*, 2002 SD 142, ¶16, 654 NW2d

at 210 (quoting *In re* Estate of Klauzer, 2000 SD 7, ¶9, 604 NW2d 474, 477 (quoting *In re* Estate of Nelson, 250 NW2d 286, 288 (SD 1977))).

*Testamentary Intent*

[¶9.]     In granting the sons an option to purchase, Testator's will describes the option price in terms of "value" and "appraised value" without further definition or qualification as to the type of value contemplated. While the Estate contends that "value" or "appraised value" is whatever value was determined by the two appraisers the personal representative selected, Melanie argues that "value" or "appraised value" means fair market value. We acknowledge that a mere disagreement between the parties over the interpretation of testamentary language is not enough to make the language ambiguous. *Id.* ¶17 (citation omitted). However, we conclude that the terms "value" and "appraised value" are ambiguous because, in this will, those terms are "reasonably capable of being understood in more than one sense." *See id.* (stating that testamentary "[l]anguage is ambiguous when it is reasonably capable of being understood in more than one sense") (citations omitted).

[¶10.]     Our conclusion that "value" and "appraised value" are susceptible to more than one meaning is supported by the South Dakota Uniform Standards of Professional Appraisal Practice (USPAP). The USPAP indicates that appraised value has different meanings because the value of property is dependent upon the relationship of the parties and how they intend to use the property; *i.e.*, value is "the monetary relationship between properties and those who buy, sell, or use those properties." Appraisal Standards Board, *USPAP: Uniform Standards of*

*Professional Appraisal Practice and Advisory Opinions* 5 (2005).[2] The comment following this provision explains:

> *Value* expresses an economic concept. As such, it is never a fact but always an opinion of the worth of a property at a given time in accordance with a specific definition of value. In appraisal practice, value must always be qualified – for example, market value, liquidation value, or investment value.

*Id.* This comment illustrates that the same property often has different appraised values. Furthermore, because the Testator's sons and daughter have a different relationship with this property, the terms "value" and "appraised value" have different meanings in this case.

[¶11.]     Here, Testator's neighbors explained that they appraised the land based solely on its cash flow value; *i.e.*, "what you could pay for it and make it pay for itself."[3] Mr. Engstrom, on the other hand, appraised the land at its fair market

---

2.    South Dakota statutes and administrative rules regulate appraisal practice. SDCL 36-21B-2 provides that an "appraisal is the act or process of estimating value of real estate for another and for compensation." SDCL 36-21B-3(2) and (3) authorize the South Dakota Department of Revenue and Regulation to promulgate rules defining terms and establishing uniform standards of professional appraisal practice. In promulgating these rules, the Department of Revenue and Regulation has stated that "[a]n appraisal must conform to the Uniform Standards of Professional Appraisal Practice, 2005 Edition." ARSD 20:14:06:01.

3.    The neighbors testified that they appraised the land at the value that "you could pay for it and make it pay for itself." No other explanation was provided. It appears the neighbors used a net cash flow approach to determine the value. *See Black's Law Dictionary*, 230 (8th ed 2004) (defining "net cash flow" as "[c]ash inflow minus cash outflow" and defining "cash flow" as "[c]ash receipts minus cash disbursements for a given period").

value.[4]  Therefore, the dispositive question is whether Testator intended the land to be appraised at the neighbors' cash flow value or the appraiser's fair market value. After considering the entire will, the circuit court concluded that Testator intended that the property be appraised at its fair market value.  We agree.

[¶12.]        The Estate contends that the circuit court's interpretation of the will was incorrect because the court did not consider the second paragraph of Item IV, which suggested that Testator's friends and neighbors would appraise the property. The Estate concedes that the circuit court's fair market value interpretation would have been correct if the will did not contain the suggested appraisers provision. However, the Estate argues that if the court had considered the language regarding the suggested appraisers, it would have concluded that Testator intended the neighbors' appraisal to be controlling.  The Estate relies on the general rule that absent bad faith or fraud, a named appraiser's valuation is generally deemed conclusive.  The Estate cites four cases applying this general rule:  *Matter of Bock's Estate*, 198 Neb 121, 251 NW2d 872 (1977);[5] *In re Lorimor's Estate*, 216 NW2d 349

---

4.    "[F]air market value is 'the price a willing buyer would pay a willing seller, both under no obligation to act.'"  Fausch v. Fausch, 2005 SD 63, ¶9, 697 NW2d 748, 752 (quoting First Western Bank Wall v. Olsen, 2001 SD 16, ¶17, 621 NW2d 611, 617).

5.    In *Matter of Bock's Estate*, 198 Neb 121, 251 NW2d 872 (1977), the testatrix's will granted her son the option to purchase property.  *See id.* at 122, 251 NW2d at 873-74.  The will provided that the option price was to "be determined and fixed by the individual or person who appraises real estate for the Federal Land Bank in Gage County, Nebraska."  *Id.* at 122, 251 NW2d at 873.  The executor of the estate was to "request that he make an appraisal of said real estate to determine its fair and reasonable market value as of the date of . . . death."  *Id.* at 122, 251 NW2d at 873-74.  And, "[i]f the Federal Land Bank appraiser [was] unavailable or unable to make said appraisal, . . .

(continued . . .)

(Iowa 1974);[6] *In re Giffin's Estate*, 166 NW2d 800 (Iowa 1969);[7] and *In re Eckey's*

*Estate*, 192 Iowa 572, 185 NW 118 (1921).[8]

_____

the real estate firm of Eyth-Krecklow, Beatrice, Nebraska, [was to] make said appraisal." *Id.* at 122, 251 NW2d at 874.
Due to company policy, the appraiser at Federal Land Bank was prohibited from making the appraisal. *Id.* at 123, 251 NW2d at 874. Mr. Krecklow then submitted an appraisal reporting the fair market value of the land at $36,800. *Id.* Appellant argued that the appraisal was too low. *Id.* at 123-24, 251 NW2d at 874. The court overruled appellant's objection stating:

> Under a will providing that a son of the testatrix who,
> also, was designated as executor of her estate be granted
> an option to purchase certain real estate at its fair market
> value to be fixed by an appraiser named in the will, the
> value fixed by the appraiser named in the will is
> controlling in the absence of bad faith or fraud.

*Id.* at 125, 251 NW2d at 875 (citations omitted).

6.  In *In re Lorimor's Estate*, 216 NW2d 349 (Iowa 1974), the testator's will granted his two sons the option to purchase farm land at a fair and reasonable price. *Id.* at 350. Testator directed in his will that the land "shall be appraised by three competent disinterested appraisers appointed by the Court, at its fair and reasonable market value, as determined by the appraisers . . . and that said beneficiaries . . . [s]hall have the right to acquire the farm at the appraised value." *Id.* The court appointed the Iowa Inheritance Tax Appraisers for Fremont County to make the appraisal. *See id.* at 351. Appellants objected to the appraisal. *Id.* The Iowa Supreme Court held:

> In clear unambiguous terms he chose to authorize the court
> admitting his will to probate to name three disinterested persons to
> fix the price to be paid -- its fair and reasonable market value as
> determined by the appointed appraisers. The fair and reasonable
> market value fixed by the appraisers was controlling in the absence
> of bad faith or fraud. Hence, in the absence of an allegation of bad
> faith or fraud the objectors set forth no basis upon which the relief
> asked for could have been granted.

*Id.* at 354 (citation omitted).

[¶13.]	Although these cases apply the rule suggested by the Estate, the cases

are distinguishable.  We initially note that in *Bock* and *Lorimor*, the wills

---

(. . . continued)

7.	Testatrix's will in *In re Giffin's Estate*, 166 NW2d 800 (Iowa 1969), contained an option to purchase her real estate.  *Id.* at 800.  The will provided that the real estate "shall be appraised by the inheritance tax appraisers" and that certain individuals "shall have the opportunity to purchase said real estate at the appraised value thereof."  *Id.*  Appellants objected to the appraisal, claiming that it was $272.13 per acre below the real estate's fair market value and that the appraisers failed to follow provisions in the Iowa code that provided "the appraised value shall be the 'market value in the ordinary course of trade.'"  *Id.* at 801.  The Iowa Supreme Court agreed with the trial court's conclusion:

> That an option to purchase may be granted by will.  That the testatrix had the right to grant such an option to whomever she chose and to prescribe the method for arriving at the price to be paid.  Having done so, and absent a showing of bad faith affecting the appraisal which is not alleged, the optionee is entitled to purchase at the valuation thus determined.

*Id.*

8.	In *In re Eckey's Estate*, 192 Iowa 572, 185 NW 118 (1921), the will provided that decedent's real and personal property was to "be appraised and divided equally between [the] children"; that the real estate was "to be appraised by three disinterested parties," who were specifically named; and that if any of the children resided on the real estate, they were to have the first chance to purchase the property at the appraised value.  *Id.* at 119.  When the two children that were residing on certain parcels of property elected to purchase the property at the appraised value, the other children objected, alleging, *inter alia*, that the appraisals did not represent the fair market value of the property.  *Id.*  The Iowa Supreme Court rejected Appellants' argument, stating:

> The appraisers fixed the values, and there is no claim or evidence that they acted otherwise than in good faith.  The testator had the right to dispose of his property as he saw fit, either by absolute gift or by sale at a price to be fixed in manner agreeable to him.

*Id.*

specifically provided that the appraisals were to be made at the properties' fair market values. *See Bock*, 198 Neb at 122, 251 NW2d at 873-74 (requesting that the land be appraised at "its fair and reasonable market value"); *Lorimor*, 216 NW2d at 350 (stating that the land "shall be appraised . . . at its fair and reasonable market value"). In contrast, Testator's will does not describe the type of value to be used.

[¶14.] More importantly, in all four cases, the wills *mandated* that a particular person or group of persons would perform the appraisal and determine the option price. In *Bock*, the will stated that the option price "*shall be* determined and fixed by" the Federal Land Bank appraiser, and if he was unavailable, the will "direct[ed] that the real estate firm of Eyth-Krecklow" would perform the appraisal. 198 Neb at 122, 251 NW2d at 873-74. The will in *Lorimor* provided that the farm land "shall be appraised by three competent disinterested appraisers *appointed by the Court*." 216 NW2d at 350 (emphasis added). In *Giffin*, the will specifically stated that the real estate "shall be appraised by the inheritance tax appraisers." 166 NW2d at 800. And, in *Eckey*, the will provided that the real estate was "to be appraised by three disinterested parties" who were, thereafter, specifically named. 185 NW at 119.

[¶15.] However, in this case, the will merely stated, "I would *suggest* that my Executor use *one or all* of the following appraisers . . . my friends and neighbors, Jack Bailey and Alfred Overlie, and my friend and attorney, Ellsworth F. Wilkinson of De Smet, South Dakota."[9] This distinction is significant because the word

---

9. We acknowledge the last sentence of Item IV stating: "If, of course, I have already conveyed the property, then the Executor can use such appraiser as

(continued . . .)

"suggest" gave the personal representative discretion over who would perform the appraisal and, through that choice, the type of appraisal that would be conducted. Because the will gave the personal representative discretion, the general rule involving a *controlling provision* is inapplicable.

[¶16.] The Estate, however, argues that the word "suggest" is precatory and that we should not be "distracted" by it because the personal representative followed Testator's suggestion in choosing two of the three suggested appraisers. However, ignoring Testator's use of the word "suggest" is contrary to the well established requirement that, in determining testamentary intent, all words and provisions in a will should be given effect "and none should be cast aside as meaningless." *Estate of Jetter*, 1997 SD 125, ¶20, 570 NW2d at 31. Failing to acknowledge the difference between "suggest" and a controlling provision would render the word "suggest" meaningless in this will. In each of the Estate's cited cases, the wills contained a controlling provision mandating that a particular person or group of persons would perform the appraisal and determine the option price. The Estate, however, concedes in its brief that "[t]he use of Bailey and Overlie clearly was not mandated by [this] Will." Under these circumstances, the word "suggest" has a very different meaning than the controlling language in the Estate's cited cases, and it cannot be ignored.

_____

(. . . continued)

he desires." We view this conflicting provision as only creating further ambiguity. If the property was "already conveyed" there would be no need for an appraisal.

[¶17.]     It is also significant that, as previously noted, the word "suggest" provided Marshall with discretion in choosing the appraisers. Furthermore, as the personal representative, Marshall was "a fiduciary," who was required to "observe the standards of care in dealing with the estate assets" and to "use . . . the terms of the will" to act in "the best interests of the estate." SDCL 29A-3-703.[10] *See also* Ward v. Lange, 1996 SD 113, ¶12, 553 NW2d 246, 250 ("When such relationship exists, the fiduciary has a 'duty to act primarily for the benefit of the other.'") (citations omitted). Thus, Marshall's fiduciary duties along with the discretion granted by the terms of the will, *i.e.*, the word "suggest," required use of a fair market value appraisal because only a fair market valuation would satisfy Marshall's fiduciary duties of acting in the best interest of Melanie, the other sons, and the estate.

[¶18.]     Considering the discretion this will afforded the personal representative, a more analogous case is *Estate of Blouin*, 490 A2d 1212 (Me 1985).

---

10.    SDCL 29A-3-703 provides the general fiduciary duties of the personal representative. The statute provides, in part:

> (a) A personal representative is a fiduciary who, except as otherwise provided in the will, shall observe the standards of care in dealing with the estate assets that would be observed by a prudent person dealing with the property of another. A personal representative is under a duty to settle and distribute the estate of the decedent in accordance with the terms of any probated and effective will and this code, and as expeditiously and efficiently as is consistent with the best interests of the estate. A personal representative shall use the authority conferred by this code, the terms of the will, if any, and any order in proceedings to which the personal representative is party for the best interests of the estate.

In that case, a decedent's son was appointed to serve as the executor. *Id.* at 1214. The son also had an option to purchase estate property "at its appraised value," and he had the discretion to choose the appraiser. *See id.* The appraiser selected by the son valued the property at $16,000. *Id.* The decedent's two daughters, who were residuary beneficiaries, objected to the appraised value, and the probate court concluded that the fair value of the property was $28,000. *Id.* On appeal, the son challenged the probate court's power to amend the appraisal. *Id.* In upholding the probate court's decision, the Supreme Court of Maine stated:

> We recognize that the terms of the will authorized the sale to [the son] at the property's "appraised value." From an examination of the will, however, we agree with the Probate Court that "appraised value" is the functional equivalent of "fair value."
>
> The will evinces the testator's intention to treat his children equally. To interpret "appraised value" as anything but fair value would result in [the son] benefiting from the sale at the expense of the other beneficiaries. After hearing, the Probate Court determined the fair value of the property to be $28,000, which we have held conclusive. The original appraisal of $16,000 represents only 57% of the court's determination of fair value.

*Id.* at 1216.

[¶19.] Similarly, this will quite clearly indicates that Testator intended to treat his children equally. In Item II, Testator bequeathed eighty acres of land to his three sons and required them to pay Melanie a pro rata share of the value of the land. Item III provided that any notes and mortgages held by Testator from the sale of his real and personal property should be considered assets of the estate and "divided equally" among the children. Item IV provided that although the sons were to have the option to purchase the farm land, they were required to pay

Melanie one-quarter of the value of the property. And, finally, Item V provided that the remainder of the estate was to be distributed to all four children, "share and share alike."

[¶20.] Therefore, considering Testator's desire to treat his children equally, and absent a controlling appraisal provision, we agree with the circuit court that Testator intended the property to be appraised at its fair market value. To conclude otherwise would subvert Testator's intent to treat his children equally as it would benefit the sons at Melanie's expense. Such a result would be especially inappropriate in a case like this where one of the sons possessing the option to purchase was also the personal representative who had discretion to select the appraisers, and the selected appraisers valued the land at approximately 48% of its fair market value.

[¶21.] Considering the absence of a controlling provision in the will, the personal representative's fiduciary duties, and the Testator's intent to treat all of his children equally, we hold that the Testator intended the terms "value" and "appraised value" to mean fair market value.[11] Therefore, we affirm the trial court.

---

11. Other jurisdictions have concluded that "appraised value" means "fair market value." *See* Estate of Blouin, 490 A2d 1212 (Me 1985); Pate v. Ford, 293 SC 268, 287, 360 SE2d 145, 156 (CtApp1987) *rev'd on other grounds by* Pate v. Ford, 297 SC 294, 376 SE2d 775 (1989). In *Pate*, the will provided the children with the option to purchase the family home "at its appraised value." *Id.* The court stated: "'Appraised value' usually means 'fair market value' or the price property will bring on the market after reasonable efforts to find a buyer who would give the highest price for it." *Id.* (citing *Blouin*, 490 A2d 1212; McAdams v. Bolsinger, 57 Ohio Op 338, 129 NE2d 878 (1950); *cf.* Housing Auth. of City of Charleston v. Olasov, 282 SC 603, 320 SE2d 478 (CtApp 1984).

*Appellate Attorney's Fees*

[¶22.]       Both parties moved for appellate attorney's fees under SDCL 15-26A-87.3.  "SDCL 15-26A-87.3 permits an award of appellate attorney fees if they are otherwise allowable . . . ."  Schaefer *ex rel.* S.S. v. Liechti, 2006 SD 19, ¶20, 711 NW2d 257, 264 (quoting *In re* Writ of Certiorari as to Wrongful Payments of Attorney Fees Made by Brookings Sch. Dist. Sch. Bd., 2003 SD 101, ¶25, 668 NW2d 538, 547).  SDCL 29A-3-720 permits an award of beneficiary's attorney's fees when the services resulted "in a substantial benefit to the estate."  *See* Wagner v. Brownlee, 2006 SD 38, ¶¶14-15, 713 NW2d 592, 597 (concluding that beneficiary attorney's fees are available when the beneficiary's actions resulted in a substantial benefit to the estate) (citing *In re* Estate of Siebrasse, 2004 SD 46, ¶¶26-29, 678 NW2d 822, 828-29).  Here, Melanie was successful in arguing that the land should have been appraised at its $290,000 fair market value rather than the $140,000 cash flow value.  This increase substantially benefited the estate, and therefore, we grant Melanie's motion for attorney's fees in the amount of $5,916.05.  Because the Estate was unsuccessful in this appeal, its motion for attorney's fees is denied.

[¶23.]       Affirmed.

[¶24.]       GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.