2001 SD 123

**ESTATE OF Leslie Mary
MARTIN, Deceased.**

**No. 21760.**

Supreme Court of South Dakota.

Considered on Briefs Aug. 28, 2001.

Decided Oct. 10, 2001.

Thomas P. Tonner of Tonner, Tobin and King, Aberdeen, for appellants Melody Pullan and Susan Maestas.

Kennith L. Gosch of Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, for appellee Ann Sheridan.

SABERS, Acting Chief Justice.

[¶ 1.] Prior to taking a trip to Rapid City, Leslie Martin, the decedent, handwrote a will leaving all of her property to her daughter, Ann Sheridan. The will left nothing to Martin's other two daughters, Susan Maestas and Melodee Pullan. Upon discovery of the holographic will, Ann filed a petition for Formal Probate of Will. Susan and Melodee filed an objection to Probate of Will. The trial court determined that Martin had created a valid and absolute holographic will and admitted the will to probate. Susan and Melodee appeal. We affirm.

## FACTS

[¶ 2.] The decedent, Leslie Martin, died on March 17, 2000. She was survived by three daughters, Ann Sheridan, Susan Maestas, and Melodee Pullan. In a writing purporting to be a holographic will, Leslie left all of her property to Ann. She made no provision for Susan or Melodee.

[¶ 3.] Leslie had a very strained relationship with both Melodee and Susan. The rift between Leslie and Melodee resulted from events that occurred during Leslie's divorce from her husband Bert in April 1997. During the divorce proceedings, Melodee testified for her father. Leslie believed Melodee had sided with Bert and against Leslie. After the divorce, Leslie had little or no contact with Melodee.

[¶ 4.] Leslie and Susan had a tenuous relationship for many years. While Leslie, Ann and Ann's children were visiting Susan's family, Susan's husband disciplined one of Ann's children. Leslie believed Susan's husband had physically injured the child and sided with the child. Susan sided with her husband. After the incident, Susan refused any contact with Leslie and would not allow her children to see Leslie or receive gifts or cards from her.

[¶ 5.] Leslie and Ann had a very close relationship. Following her separation from Bert, Leslie spent a great deal of time with Ann and her family. Leslie regularly spent time with Ann's two children. When Leslie was diagnosed with bowel cancer in late 1999, Ann and her husband helped care for Leslie. Ann also assumed Leslie's office cleaning responsibilities and used the money received to help pay Leslie's expenses.

[¶ 6.] On August 22, 1998, prior to a trip to Rapid City, Leslie told her friend Marilyn Thorson that she wanted to leave all of her property to her daughter Ann and Ann's family. Leslie told Marilyn that she had not contacted a lawyer about drafting a will and wondered if she could just write something out. Marilyn thought Leslie could make an effective will if she

wrote out what she wanted done with her property and signed and dated the writing. The will read as follows:

Dated this day,

August 22, 1998

If anything should happen to me on this trip to Rapid City. Everything I own is to go to Ann, Sheldon, and McKensey and Bradley Sheridan. Inculding [sic] rest of money from Bert and the land.

Leslie Mary Martin

405 S. Lincoln St

Groton, So. Dak

57445

Leslie then placed the will in a blue notebook and explained to Marilyn that she had done this "so if something should happen that Ann could find it." Prior to her death, Leslie had also explained to Ann that anything she "would ever need if something would happen to her would be in this little blue book that she kept in her file cabinet." Leslie made no other wills.

[¶ 7.] Following Leslie's death, Ann and Marilyn discovered the holographic will in the blue notebook in Leslie's file cabinet. On March 30, 2000, Ann filed a Petition for Formal Probate of the holographic will. Melodee and Susan objected to probate of the will, not on the grounds that it was not written by Leslie, but because it was conditional. A hearing was scheduled for July 13, 2000.

[¶ 8.] The trial court determined that the language of Leslie's will was absolute and not conditional. The court declared that the reference to the Rapid City trip was a motive or reason for drafting the will rather than a contingency upon which the will was based.

[¶ 9.] The trial court supported its determination with extrinsic evidence, including Leslie's personal diary, Leslie's comments to hospital staff, and other witness testimony. The diary represented Leslie's testimony that she wanted all of her property to go to Ann and her family and nothing to Melodee and Susan. The diary further indicated that Leslie believed Melodee and Susan wanted no relationship with her and that Ann and her family were her closest friends.

[¶ 10.] The trial court further noted that, while Leslie lay dying in the hospital, she instructed the hospital staff that Melodee and Susan not be allowed to talk to her in the hospital. The trial court concluded that Leslie's conduct immediately preceding her death was consistent with her intention to leave all of her property to Ann and her family.

[¶ 11.] Other testimony offered at trial corroborated the information contained in Leslie's diaries. Marilyn Thorson testified that before writing the will Leslie told her that she wanted Ann's children to have her land and, "Ann gets everything else and those other girls are not to get a dime." Leslie explained to Marilyn that Ann was to get everything because Bert "will never give her a dime and this will be Ann's share of her money."

[¶ 12.] Leslie also told several friends that she wanted all of her property to go to Ann and her family. Karen Wolter testified that Leslie had said "I have everything taken care of and everything is to be left to Ann and her family." Shirley Pullan testified that Leslie told her "I am going to leave everything to Ann and Sheldon and the grandkids and I'm going to cut the other two out because they never had anything to do with me." Shirley also testified that Leslie had again expressed a desire to leave everything to Ann and her family and nothing to Melodee and Susan in the days immediately preceding Leslie's death. Susan Quiggle testified that Leslie told her that Susan and Melodee were getting one dollar and "Ann is getting the rest of it."

[¶ 13.] Based on the language of the will and other testimony, the trial court concluded that: (1) Leslie intended the August 22, 1998 writing to be her will; (2) the will was executed with testamentary intent; and (3) the will was testamentary in character and not the product of undue influence. *See Estate of Dokken*, 2000 SD 9, ¶ 13, ¶ 27, 604 N.W.2d 487, 491, 495 (explaining requirements for establishing testamentary capacity and existence of undue influence). The trial court declared the will to be absolute and admitted it to probate. Melodee and Susan appeal the trial court's determination that the will was absolute and not conditional.

## STANDARD OF REVIEW

[¶ 14.] This Court reviews a trial court's findings of fact under the clearly erroneous standard. *In Re Estate of Jetter*, 1999 SD 33, ¶ 11, 590 N.W.2d 254, 257.

Under the clearly erroneous standard, the question for this Court is not whether we would have made the same findings that the trial court did, but, whether on the entire evidence, we are left with a definite and firm conviction that a mistake has been committed. That this Court may have found the facts differently had we heard the testimony is no warrant for us to substitute our judgment for the trial court's carefully considered findings.

*Estate of Long*, 1998 SD 15, ¶ 9, 575 N.W.2d 254, 256.

[¶ 15.] "Questions of law are reviewed de novo." *Estate of O'Keefe*, 1998 SD 92, ¶ 7, 583 N.W.2d 138, 139.

[¶ 16.] **WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT LESLIE MARTIN'S HOLOGRAPHIC WILL WAS ABSOLUTE AND NOT CONDITIONAL.**

[¶ 17.] Melodee and Susan assert that Leslie's will was conditional rather than absolute and should not be admitted to probate.

[¶ 18.] In determining whether a will is conditional or absolute the primary inquiry revolves around the testator's intent. *Estate of Taylor*, 119 Cal.App.2d 574, 259 P.2d 1014 (1953).

Did the testator intend, by the language used, to make the happening of the possibility referred to a condition precedent to the operation of the will, in which case the instrument is not entitled to probate if the condition is not fulfilled; or did he state the possibility of the happening merely as the motive or reason which led to the making of the instrument and which was carelessly stated in language suggestive of a condition, in which case the will becomes operative on the testator's death even if the event, the possibility of which appears to have induced the will, has not taken place?

*Id.*

[¶ 19.] The general rule of will construction favors a finding of testacy over intestacy. 79 AmJur 2d *Wills* § 745 (1975). Accordingly, when possible, courts should interpret any questionable language as the testator's motivation in writing the will rather than an expression of condition. *Id. See also National Bank of Commerce v. Wehrle*, 124 W.Va. 268, 20 S.E.2d 112 (1942); *Eaton v. Brown*, 193 U.S. 411, 24 S.Ct. 487, 48 L.Ed. 730 (1904). "The courts have inclined toward a construction which will give testamentary effect to the will, and it has been said that a will is to be construed as absolute and not conditional unless the intention to the contrary clearly appears either expressly or by necessary implication from a reading of the language of the will as a whole." 1 A.L.R.3d 1048 (1965–1999 Supp.).

[¶ 20.] With respect to the testator's intent, this Court looks first to the language of the will and then to the circumstances surrounding the will's execution.

Our goal in interpreting a will is to discern the testator's intent. If the intent is clear from the language used, that intent controls. However, "[I]f ... doubt remains as to decedent's intent, the language used and the circumstances surrounding the execution of the writing will again be examined in light of pertinent rules of construction."

*Estate of Klauzer*, 2000 SD 7, ¶ 9, 604 N.W.2d 474, 477 (citing *In re Estate of Nelson*, 250 N.W.2d 286, 288 (S.D.1977)).

[¶ 21.] An examination of the language of Leslie's will yields the conclusion that the will was absolute. The language of the will should be construed as absolute and not conditional because the intention to the contrary is neither express nor necessarily implied from a reading of the language of the will as a whole. The trial court properly concluded that the reference to her Rapid City trip was not a condition but "an expression of Leslie's recognition that she could die." The trip represented the motivation behind the drafting of the will. This motivating factor is set apart from the remainder of the will and does not render ineffective Leslie's desire that all of her property go to Ann and her family.

[¶ 22.] An examination of the circumstances surrounding the execution of the will also supports the determination that the will was absolute. Leslie's conduct and comments to several disinterested individuals, before and after she made the will, and in the days immediately preceding her death, demonstrate that Leslie intended her writing to be an effective disposition of her property. While she recognized she needed to see an attorney to draft a formal will, Leslie clearly intended that her property be given to Ann and her family.

[¶ 23.] The evidence at trial indicated Leslie had a good relationship with Ann and had good reason to leave her property to Ann and her family. Additional evidence illustrated that Leslie was estranged from Susan and Melodee and had reasons for excluding them from her will. The evidence is entirely consistent with Leslie's desire to leave all of her property to Ann and her family.

[¶ 24.] Melodee and Susan have failed to demonstrate that any of the trial court's findings are clearly erroneous and we affirm.

[¶ 25.] AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

[¶ 25.] MILLER, Retired Chief Justice, having been a member of the Court at the time this action was submitted to the Court, did not participate.