#24610-rev&rem-MYREN, Circuit Judge
**2008 SD 46**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE ESTATE OF
M. ARDETH SERBOUSEK,
Deceased.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

HONORABLE LORI S. WILBUR
Judge

* * * *

AL ARENDT of
Arendt Law Office                          Attorney for appellants
Pierre, South Dakota                       Pamela Faz & Robert Serbousek.


CHARLES P. SCHROYER of
Schmidt, Schroyer, Moreno, Lee
  & Bachand, PC                           Attorneys for appellee
Pierre, South Dakota                       Eric U. Serbousek.

* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 11, 2008

OPINION FILED 6/11/08

#24610

MYREN, Circuit Judge

[¶1.]     The personal representatives for the estate of M. Ardeth Serbousek appeal the circuit court's order denying the admission of a holographic codicil to Serbousek's will. We reverse and remand.

## ANALYSIS

[¶2.]     At evidentiary hearings held in April and May of 2007, the circuit court heard evidence regarding a holographic document created by M. Ardeth Serbousek (Ardeth). Because the holographic document was found in one of Ardeth's pillows, it has become known as the "pillow note." At the conclusion of the hearing, the circuit court found that the "pillow note" was handwritten by Ardeth, but concluded that it was not a valid codicil to Ardeth's will. In making that determination, the circuit court restricted its analysis to the contents of the "pillow note" and did not consider any extraneous circumstances.

[¶3.]     We have consistently followed a two-step analysis regarding the assessment of purported holographic wills. First, we determine whether the writing complies with the statutory requirements for a holographic will. SDCL 29A-2-502.[1]

_____

1.    SDCL 29A-2-502 provides:

(a)    A will is valid as a holographic will, whether or not witnessed, if the signature and material portions of the document are in the testator's handwriting.

(b)    A will not valid as a holographic will must be:

(1)    In writing;

(2)    Signed by the testator or in the testator's name by some other individual in the

Second, we analyze whether the writing was executed with testamentary intent and demonstrated testamentary character.  Estate of Martin, 2001 SD 123, 635 NW2d 473; Estate of Pierce, 531 NW2d 573 (SD 1995).  Each case must be considered separately on its own facts and the decedent's intention "must be determined in the light of the words used in the writing, *and any extraneous circumstances bearing upon the question of intention*."  In re Zech's Estate, 70 SD 622, 626, 20 NW2d 229, 231 (1945) (emphasis added).  Extraneous circumstances that are admissible to show intent can include oral statements of the decedent. SDCL 19-16-34.  In re Congdon's Estate, 74 SD 306, 51 NW2d 877 (1952); Scott v. Liechti, 70 SD 89, 15 NW2d 1 (1944).  We reverse and remand because the circuit court did not consider the extraneous circumstances bearing upon the question of Ardeth's intention and incorrectly applied the clear and convincing evidence standard set forth in SDCL 29A-2-503.

[¶4.]       The following extraneous circumstances were established by a preponderance of the evidence through the undisputed testimony of the numerous

---

testator's conscious presence and by the testator's direction; and

(3)     Signed in the conscious presence of the testator by two or more individuals who, in the conscious presence of the testator, witnessed either the signing of the will or the testator's acknowledgment of that signature.

(c)     Intent that the document constitute the testator's will can be established by extrinsic evidence, including, for holographic wills, portions of the document that are not in the testator's handwriting.

witnesses. These undisputed facts were relevant to the question of whether the "pillow note" was created with testamentary intent and contained testamentary character and should have been considered by the circuit judge.

[¶5.] In May of 2000 Ardeth executed a Last Will and Testament that had been prepared at her request by her attorney. In that will she left a specific parcel of land in Sully County (70-acre parcel) to three of her grandsons, "with hopes that my grandsons will continue to use said land for hunting enjoyment." In that will she left the remainder of her property to her seven children equally.

[¶6.] On July 20, 2000, Ardeth executed a declaration of irrevocable family trust which named her seven children and their issue as beneficiaries of the trust. At the same time Ardeth transferred all real property that she owned into the trust, except the 70-acre parcel. The purpose of this trust was to shield the trust property in the event that Ardeth incurred significant medical or care expenses as she aged.

[¶7.] On May 15, 2002, Ardeth created a codicil to her will. This codicil was written entirely in her own handwriting except for a notation on the bottom that read: "Witness: Patricia de Hueck Pierre SD 57501 5/15/02." This handwritten codicil provided that her daughter Mary Pease was not to take under the will until she had returned specified personal property that Ardeth believed was in her possession.

[¶8.] In August 2005 Ardeth executed a typewritten codicil that had been prepared by an attorney at her request. This codicil altered her will by designating three of her children as her co-personal representatives.

[¶9.]       In the middle of August 2005 Ardeth fell and broke her shoulder. This injury required medical care and hospitalization. Ardeth left the hospital and entered transitional care in September 2005 and then lived the remainder of her life with her daughter Mary Pease.

[¶10.]      During the last months of her life, Ardeth told several of her children that she was concerned that the 70-acre parcel had been devised in her will to only three of her grandchildren. She explained that her other eleven grandchildren were growing up and some were also becoming interested in hunting. Ardeth expressed similar concerns to her brother, Gerald Vrooman. Ardeth told Larry Serbousek that she wanted to have a change made in her will. Around the same time, Ardeth told her daughter Janette Byer that she wanted to change her will. Ardeth asked Janette to make an appointment with an attorney around Thanksgiving. Ardeth wanted the appointment to take place around Thanksgiving so that her other daughter (Colleen Sandall from Texas) could accompany her to the appointment. Colleen had taken Ardeth to the attorney on a prior occasion. Ardeth asked Colleen if she would accompany her to the attorney's office over Thanksgiving. Colleen agreed.

[¶11.]      Janette Byer, Larry Serbousek, and Mary Pease all testified that Ardeth signed her legal documents as "M. Ardeth Serbousek." Janette Byer, Colleen Sandall, and Pamela Faz all testified that Ardeth was of sound mind and capable of forming testamentary intent through the day of her death. No one testified to the contrary on either point.

#24610

[¶12.]     Ardeth knew that her death was approaching.  On her final day she met with a funeral director and made final arrangements for her funeral.  She even went so far as to write a check to pay for the funeral.  Later that same day, November 9, 2005, Ardeth died while at the doctor's office for a routine appointment.

[¶13.]     At some point prior to her death, Ardeth drafted a handwritten document that read:

Oct 2006[2]

> Please help me change will. I must make <u>right for Dad</u> and all you kids and grandkids. I'm afraid time is short. I want 70 acres equal for all our children. Try to save for hunting for <u>all interested grandkids.</u>  Thank you for taking good care of me. I'm sorry for not always being nice.  I love you all.
>
> Mom
>
> M. Ardeth Serbousek

[¶14.]     Ardeth placed that note in one of her pillows.  She then placed a yellow "stick-it" note in a book entitled *Chicken Soup for the Soul Celebrates Grandmothers.*  Ardeth's daughter Janette Byer had given her this book during her recuperation from the fall.  This book was significant to Ardeth and Janette because Janette and her daughter had spent time reading the book to Ardeth.  The yellow "stick-it" note read:  "Check in my pillow."

[¶15.]     After Ardeth died, the family was advised that no probate would be necessary because of the trust.  Because of that advice and a number of family

---

2.     The October 2006 date was obviously a clerical error by Ardeth given that the trial court found that the note was in her handwriting.  *Infra.* ¶ 18.

health emergencies, no action was taken to initiate a probate proceeding until nearly a year after Ardeth's death.

[¶16.] All of Ardeth's belongings had been gathered, but most had not been distributed. On October 16, 2006, Janette Byer was paging through *Chicken Soup for the Soul Celebrates Grandmothers*. On page 75 she found the yellow "stick-it" note that read: "Check in my pillow." Mary Pease was present when Janette found the note.

[¶17.] Ardeth had two pillows at the time of her death. Colleen Sandall had taken one of the pillows with her to Texas. Janette Byer had kept the other pillow in her home in Pierre. Upon finding the "stick-it" note, Janette went and retrieved the pillow. She gave it to Mary Pease who discovered the "pillow note" inside.

[¶18.] Six of Ardeth's seven children (Janette Byer, Robert Serbousek, Larry Serbousek, Colleen Sandall, Pamela Faz, and Mary Pease) and Ardeth's brother Gerald Vrooman testified that the "pillow note" was in Ardeth's handwriting. The only child of Ardeth that testified that it was not her handwriting was her son, Charles Serbousek. The circuit judge resolved this factual dispute and found that the "pillow note" was in Ardeth's handwriting.

[¶19.] Charles Serbousek and his son, Eric Serbousek, were the only heirs that opposed the admission of the "pillow note." Each of Ardeth's children, except Charles, testified that they believed the "pillow note" expressed Ardeth's intention to change her will to leave the 70-acre parcel to all of her children for the benefit of all of her grandchildren. This included the parents of her other two grandsons who would have received a one-third interest in the 70-acre parcel under the will. Those

two grandsons did not object to the admission of the "pillow note," even though it effectively eliminated their ownership interest in the 70-acre parcel.

## CONCLUSION

[¶20.]     Ardeth's "pillow note" is entirely written in her handwriting and is signed.  It fulfills the formality requirements for a holographic will.  Estate of Nelson, 250 NW2d 286, 287 (SD 1977).  Ardeth's testamentary intent and the testamentary character of the document are established by the document and the extraneous circumstances.

[¶21.]     During the final weeks of her life Ardeth spoke to several of her children and her brother and repeatedly expressed her intention to change her will. She arranged to have an appointment scheduled to meet with an attorney so that she could change her will.  Ardeth had previously created a holographic codicil to her will.  Ardeth knew that death was rapidly approaching.  Ardeth hoped and intended to meet with an attorney to change her will.  As a precaution, Ardeth handwrote the "pillow note" to accomplish her intentions in case she died before she was able to meet with the attorney.  Ardeth's testamentary intent is established by her expressed intention to change her will, by her request in the "pillow note" for help in changing her will, and by her acknowledgement of her imminent death ("time is short)."  It is further established by the fact that she used the same signature she used to sign her legal documents.

[¶22.]     The "pillow note" alters one paragraph of Ardeth's Will.  Consequently, it can and should be read in conjunction with and in relation to that will.  When read in that context, there can be no doubt about which seventy acres Ardeth was

addressing. Although her note is brief, when it is read in the light of her contemporaneous conversations about her concerns, it is clear that she intended to change her will so that the seventy-acre parcel would be shared equally among her children with the hope that *all* of her grandchildren could enjoy hunting on the land.

[¶23.]    The circuit court's order is reversed and the case is remanded with instructions that the "pillow note" be admitted into probate and interpreted to devise the 70-acre parcel to Ardeth's seven children equally.

[¶24.]    Reversed and remanded.

[¶25.]    GILBERTSON, Chief Justice, SABERS, KONENKAMP and MEIERHENRY, Justices, concur.

[¶26.]    MYREN, Circuit Judge, for ZINTER, Justice, disqualified.